UNITED STATES of America, Plaintiff,

v.

I.I. OZAR, a/k/a Izzy Ozar, Larry J. Bridges, and Sherman W. Dreiseszun, Defendants.

No. 92–00183–02/04–CR–W–2.

United States District Court, W.D. Missouri, Western Division.

June 1, 1994.

---

**1548**

R. Stan Mortenson, David R. Fontaine, Paul Enzinna, Miller, Cassidy, Larroca & Lewin, Washington, DC, for defendant Frank S. Morgan.

Terence J. Thum, Bryan Cave, Kansas City, MO, James L. Eisenbrandt, Bryan Cave, Overland Park, KS, R. Stan Mortenson, David R. Fontaine, Paul Enzinna, Miller, Cassidy, Larroca & Lewin, Washington, DC, for defendant I.I. Ozar, aka Izzy Ozar.

Thomas J. Bath, Jr., Bryan Cave, Overland Park, KS, Charles W. German, Rouse, Hendricks, German, May & Shank, P.C., Kansas City, MO, for defendant Larry J. Bridges.

R. Stan Mortenson, David R. Fontaine, Paul Enzinna, Miller, Cassidy, Larroca & Lewin, Washington, DC, Robert J. Campbell, Lewis, Rice & Fingersh, Kansas City, MO, for defendant Sherman W. Dreiseszun.

Matt J. Whitworth, Marietta Parker, U.S. Attys. Office, Kansas City, MO, for plaintiff U.S.

## ORDER

GAITAN, District Judge.

Pending before this Court is the defendants' joint motion to suppress, filed June 22, 1993. Defendants seek to suppress the fruits of an electronic surveillance conducted by the Federal Bureau of Investigation (FBI) during the investigation of this case. The defendants have asserted that the suppression should be granted because: (1) there was no probable cause to support the authorization of the surveillance; (2) there was no necessity for the use of the electronic surveillance; and (3) the United States failed to properly minimize the electronic surveillance it did undertake.

On February 8, 1994, Chief United States Magistrate John T. Maughmer filed a 96 page report and recommendation to this Court. Judge Maughmer's recommendation was based upon an extensive evidentiary hearing which lasted approximately three weeks. The conclusion that he reached and recommended to this Court is that the defendants' joint motion to suppress be granted. On March 8, 1994, the United States filed its objections to the report and recommendation. The government's response totaled 195 pages. Thereafter, On April 8, 1994, the defendants filed their joint response to the United States' objection. Their response totaled 153 pages.

This Court has reviewed these filings which total approximately 443 pages plus supportive documentation, and after much thought has decided to grant the joint motion to suppress. In doing so, this Court adopts the report and recommendation of the Magistrate. The proposed findings of fact and conclusions of law are adopted as this Court's findings of fact and conclusions of law. There is no useful purpose served in this Court filing a separate findings of fact and conclusions of law.

By granting this joint motion to suppress, this Court does not pass judgment on FBI electronic surveillance in general. This Court merely addresses the problems associated with those relating to this case. Those problems are numerous and are reflected in the report and recommendation.

Wherefore, it is ordered that defendants' joint motion to suppress is granted.

## REPORT AND RECOMMENDATION

MAUGHMER, Chief United States Magistrate Judge.

On October 18, 1992, the grand jury returned a ten-count indictment charging De-

fendants Frank Morgan,[1] I.I. Ozar, Sherman W. Dreiseszun and Larry J. Bridges with conspiring to defraud the United States in the bidding process for government leases in violation of 18 U.S.C. §§ 371, 1031 and 1001. Presently pending before this Court is defendants' motion to suppress the fruits of the electronic surveillance conducted by the Federal Bureau of Investigation ("FBI") during the investigation of this case. In arguing for suppression, defendants allege that: 1) there was no probable cause to support the authorization of the surveillance; 2) there was no necessity for the use of electronic surveillance; and 3) the United States failed to properly minimize the electronic surveillance it did undertake.

In order to fully consider the issues presented by the defendants, this Court conducted an extensive evidentiary hearing over a period of 21 days, listening to the testimony of over 25 witnesses and admitting over 280 exhibits into evidence. On the basis of that hearing, the record, and the arguments of counsel, this Court submits the following proposed Findings of Fact and Conclusions of Law[2] and accordingly recommends that the District Court enter an order granting defendants' motion to suppress evidence.

## I. Proposed Findings of Fact

### A. BACKGROUND INFORMATION

1. On June 5, 1991, a federal district court granted the government's request to conduct audio and video surveillance of Defendant Morgan, Defendant Ozar, Defendant Bridges, Defendant Dreiseszun, David Feingold "and others as yet unknown" during Saturday morning business meetings being conducted at the offices of M–D Management, Inc. An Affidavit of a Special Agent of the Federal Bureau of Investigation ("the June 5 Affidavit") accompanied the application for electronic surveillance and provided the only information presented to the district court in support of the government's request.

2. M–D Management was a management company owned and controlled by Morgan and Dreiseszun. Both Morgan and Dreiseszun had offices at M–D Management and conducted many of their business activities there. In particular, Morgan and Dreiseszun regularly held Saturday morning meetings at M–D Management's offices with Bridges, Feingold and a host of other business associates.

3. Initially, electronic surveillance at M–D Management was only authorized during these Saturday morning business meetings. This limited surveillance was conducted on Saturdays from June 8, 1991 through August 20, 1991. However, after August 20, 1991, daily electronic surveillance at M–D Management was authorized by the district court. Ultimately, on September 27, 1991, the court further extended the surveillance to include a wiretap on the telephones at M–D Management.[3] Electronic surveillance at M–D Management ended on December 12, 1991.

4. Morgan and Dreiseszun were business partners involved in a wide variety of business enterprises in the Kansas City area, including banking, commercial real estate development and shopping centers. Suffice it to say that their financial presence and control permeated the Kansas City business community.

5. Ozar was a long time business associate of Morgan and Dreiseszun, and owned interests, along with Morgan and Dreiseszun, in several partnerships.

6. Feingold was Morgan's son-in-law, the president of Metro North State Bank ("Metro North") and also owned interests in sever-

---

1. On October 23, 1993, defendant Frank Morgan died. He was dismissed as a defendant in this case on October 27, 1993.

2. At the hearing, there were some conflicts in the testimony of the witnesses. To compile the proposed Findings of Fact, credibility determinations were necessary. In making those credibility determinations, the Court considered: (1) the demeanor of the witnesses on the witness stand, 2) the interest the witness had in the outcome of the motion, and (3) the opportunity the witness had to hear, observe and recall what was said or done.

3. The June 5 Affidavit was the sole basis for the initial application for electronic surveillance at M–D Management. Subsequent applications for extended and additional electronic surveillance were based on the June 5 Affidavit plus additional information obtained as a result of the preceding electronic surveillance.

al partnerships with Morgan, Dreiseszun, and Ozar.

7. Other key business associates included Bridges, a real estate developer in the Kansas City area, and his former business partner, Ted Ehney. Bridges and Ehney originally jointly owned Executive Hills, Inc. ("Executive Hills") and were responsible for developing many commercial real estate projects in the Kansas City area, at times in conjunction with Morgan, Ozar and/or Dreiseszun. GX 4 at 40.[4] In December of 1988, Bridges and Ehney formally split their business interests with Ehney assuming sole ownership of Executive Hills North, Inc. ("Executive Hills North"), and Bridges assuming sole ownership of Executive Hills. Executive Hills and Executive Hills North received substantial financing from Metro North and Home Savings Association ("Home Savings").

8. Among the many business interests held by Morgan, Ozar and Dreiseszun were Home Savings and Metro North. Morgan, Ozar and Dreiseszun also sat on the Board of Directors for these institutions.

## B. FINDINGS OF FACT REGARDING THE EXISTENCE OF PROBABLE CAUSE IN THE JUNE 5 AFFIDAVIT

9. The June 5 Affidavit relied on information from four sources: an Office of Thrift Supervision ("OTS") criminal referral, an OTS examiner, Lloyd Steven Grissom and Randy Nay.

(i) **OTS Criminal Referral**—After conducting a routine audit of Home Savings, the OTS filed a criminal referral with the FBI regarding loan transactions between Home Savings, Bridges, Ehney and their companies. This criminal referral provided the basis for some information contained in the June 5 Affidavit.

(ii) **OTS Examiner**—The OTS examiner for Home Savings who participated in the examination of Home Savings that occurred during the ten months prior to the March, 1991 seizure of Home Savings by federal regulators also provided information that was included in the June 5 Affidavit. Tr. 841.[5]

(iii) **Lloyd Steven Grissom**—Lloyd Steven Grissom, a business associate of Ehney and the accountant and comptroller of Executive Hills North from 1986 to 1989, approached the FBI in late 1989 and offered to cooperate with the government in its investigation of Ehney and Executive Hills North in exchange for immunity in that case. Tr. 40, 984, Tr. [9/18/93 Vol. II] 48–49. In cooperating with the Executive Hills North investigation, Grissom provided substantial information concerning the illegal activities of Ehney. Tr. 985–86.

(iv) **Randy Nay**—Randy Nay held various positions at Home Savings, ranging from Vice President to Vice Chairman, during his fifteen year tenure with the savings and loan association. Nay departed from Home Savings in December of 1989. Tr. [9/7/93] 66–67.

10. The June 5 Affidavit relied on several activities involving Morgan, Ozar, Dreiseszun, and Bridges as bases for probable cause to believe that criminal activity was occurring or being discussed at M–D Management during the Saturday morning meetings. These activities can be broken down into two critical groups—historical activity[6] and ongoing activity.

11. Those respective groups of activities were based on information on several subjects obtained from various sources as reflected below:

### 1. HISTORICAL ACTIVITY

#### Subject (Source)

a. One Petticoat Lane (OTS Referral)

---

4. Government exhibits are cited as "GX." Defense exhibits are cited as "DX."

5. Citations to the transcript of the government's case are cited "Tr.", followed by the page number. However, the court reporter transcribing the defendant's case began each day's transcript as page 1 rather than continuing with the consecutive page number from the day before.

Therefore, citations to the transcript of defendant's case are cited "Tr." followed by the date, as well as the page number.

6. All of the historical activity described in the June 5 Affidavit had occurred by July 1989, and, thus, involved activities that had taken place nearly two years prior to the date of the Affidavit.

b. Metro North Loans to Bridges (OTS Referral)

c. Home Savings $26 Million Loan (OTS Referral)

d. Pars Lease (Grissom)

e. Kickbacks (Grissom)

f. Saturday morning meetings (Nay and Grissom)

## 2. ON–GOING ACTIVITY

### Subject (Source)

a. 127th & Antioch Property (Grissom)

b. Standstill Agreement (OTS Examiner)

This Report and Recommendation addresses each of the above subjects in turn, first making all the necessary Findings of Fact and then turning to the Conclusions of Law.

### 1. *Findings of Fact Regarding Historical Activity*

12. Following an examination of Home Savings in 1990, the OTS prepared a criminal referral which the FBI received in February, 1991. Although there had been some minimal mention of Morgan in an earlier 1989 FBI investigation of Executive Hills North and Ehney, the receipt of the OTS criminal referral in February, 1991 marked the real beginning of the FBI investigation of Morgan, Ozar, Dreiseszun, Bridges and Feingold. Tr. 27.

13. The OTS criminal referral generally contended that the proceeds of certain loans made to Bridges and Ehney by Morgan-controlled financial institutions, such as Home Savings and Metro North, found their way into various partnerships in which Morgan, Ozar and Dreiseszun had interests. The OTS criminal referral additionally contended that Morgan, Ozar and Dreiseszun did not disclose their interests in these partnerships to federal bank regulators or the involved financial institutions. Tr. 26, 51–52.

14. The OTS criminal referral was comprised of preliminary investigative findings and identified further investigation that might assist law enforcement authorities in fully examining the existence of a potential violation. Tr. 1708–13; GX 96, DX 493 at 6.

15. Upon receipt of the OTS criminal referral, the FBI did not conduct its own review of the work papers accompanying the referral to determine for itself whether the conclusions in the criminal referral were properly supported. Tr. 149–51, 456, 1708–13. According to the FBI, it had no reason to question the accuracy of the allegations in the criminal referral. Tr. 456.

### a. Findings of Fact Regarding the One Petticoat Lane Transaction Referenced in the June 5 Affidavit

16. Relying on the OTS criminal referral, the June 5 Affidavit stated in Paragraph 19 that, in 1987, Home Savings made a loan to Executive Hills (Bridges) for construction of an office building known as One Petticoat Lane. On the date of this loan, a part of the land on which One Petticoat Lane was to be built was owned by a partnership in which Morgan, Dreiseszun and Ozar had an interest. At this same time, Morgan, Dreiseszun, and Ozar were each on the Board of Directors of Home Savings. The Morgan, Dreiseszun and Ozar interest in the One Petticoat Lane land was deeded to Executive Hills only six days after the completion of the loan from Home Savings to Executive Hills.

17. The June 5 Affidavit stated that by failing to disclose their interest in the land upon which One Petticoat Lane was to be built, Morgan, Dreiseszun and Ozar violated banking regulations. The June 5 Affidavit further stated "[t]he above also indicates possible violations of Title 18, United States Code, Section 1344" (bank fraud).

18. Although not stated specifically, presumably the reference in the June 5 Affidavit to banking regulations was to Regulation O of the Federal Reserve Act. Regulation O is a civil regulation which prohibits a bank from making loans which inure to the benefit of a principal owner or officer of the bank unless the owner or officer fully discloses this fact to the bank. Tr. 386–87, 390.

19. The OTS criminal referral concluded that *if* funds used by Executive Hills to purchase the Morgan, Ozar and Dreiseszun property had come from the Home Savings loan proceeds for the One Petticoat Lane

project, a "serious regulatory violation" would have taken place. However, neither the OTS criminal referral nor the June 5 Affidavit provided any explicit information that Executive Hills did in fact use the One Petticoat Lane loan proceeds—as opposed to other funds—to purchase the Morgan, Ozar, and Dreiseszun property.

20. The June 5 Affidavit also cited the deposit of a portion of the One Petticoat Lane construction loan proceeds into the account of One Kansas City Place, a partnership in which Morgan, Ozar, Dreiseszun and Bridges each had an interest, as possible bank fraud in violation of 18 U.S.C. § 1344. The June 5 Affidavit specifically said, in Paragraph 19(b), that "there was no documentation as to the ultimate recipient of the funds."

21. While the June 5, 1991 Affidavit stated that "there was no documentation as to the ultimate recipient of the funds," in fact, the OTS criminal referral actually said "due to the fact that the information *obtained to date* on the One Kansas City Place account does not cover the time period in which the One Petticoat Lane loan proceeds were being disbursed, we have *not yet* identified the ultimate recipient of the proceeds that went to that account from this loan. Even though the draw requests provided to Home Savings *appear to be supported* with invoices from contractors who were reportedly doing work on the One Petticoat Lane project, we cannot be sure this work was actually performed. . . ." (Emphasis added). This supplementary and explanatory information from the criminal referral was not included in the June 5 Affidavit.

22. The OTS criminal referral also stated that it appeared from Home Savings records that the One Petticoat Lane loans to Executive Hills had been paid in full by Executive Hills. Likewise, this information was not in the June 5 Affidavit.

**b. Findings of Fact Regarding the Metro North Loans to Bridges Referenced in the June 5 Affidavit**

23. The June 5 Affidavit, Paragraphs 20–23, stated that Metro North made loans of approximately $49 million over a 14 month period to Bridges and that approximately $30 million of those loan proceeds were then immediately disbursed to partnerships in which Morgan, Dreiseszun and Ozar had interests.

24. While the June 5 Affidavit quoted a figure of $49 million dollars in loans from Metro North to Bridges, the actual outstanding debt during that 14 month period never exceeded $19 million. Tr. [9/9/93] 115–19.

25. In April, 1989, the Federal Reserve Board ("FRB") expressed concern to Morgan that a civil regulatory violation might have occurred in connection with some of the Bridges loans since proceeds appeared to flow ultimately to Morgan-related partnerships. In response, all of the loans made by Metro North to Bridges were repaid. The FRB cited the parties involved for civil regulatory violations in its bank examination report. DX 424–25. However, the FRB made no criminal referral of this civil regulatory violation, sought no monetary penalties, and took no other enforcement action. Tr. 386–89, 639–44.

26. The decision of the FRB not to file a criminal referral or to seek civil monetary penalties was based on the inadvertence of the violation, the fact that the loans were repaid promptly, the absence of personal benefit to Morgan, Dreiseszun and Ozar, and the insufficiency of information available to conclude one way or the other whether there was any criminal wrongdoing. Tr. 647–50, 656–61, 666.

27. Following the FRB's examination of loans to Bridges, the FRB made its work papers available to the FDIC which was then beginning a full-scale examination of Metro North. The FDIC, which had primary regulatory authority over Metro North, did not issue a citation for regulatory violations in connection with the Metro North loans to Bridges, did not make a criminal referral and did not seek civil monetary penalties. Tr. 661–63, Tr. [9/9/93] 17–18.

28. The June 5 Affidavit did not inform the district court that both the FRB and FDIC had previously examined the Metro North loans to Bridges and, while the FRB found inadvertent civil regulatory violations,

neither regulatory agency filed a criminal referral or sought civil monetary penalties.

29. The June 5 Affidavit, Paragraph 23, stated that a portion of the funds used to repay the Bridges loan from Metro North came from a certificate of deposit owned by Bridges and that the source of these funds was "questionable." The basis for this information was the OTS criminal referral, which referred to the source of these funds as "unknown." The criminal referral never referred to the source of funds as "questionable." The June 5 Affidavit provided no explanation for the FBI conclusion that the source of these funds was "questionable" as opposed to "unknown."

### c. Findings of Fact Regarding the $26 Million Loan from Home Savings to Executive Hills North Referenced in the June 5 Affidavit

30. The June 5 Affidavit, Paragraphs 26–27, reported that, the OTS audit revealed that in early 1988, Executive Hills North, which was controlled by Ehney at that time, received $26.95 million in construction loans from Home Savings, some of the proceeds of which Executive Hills North illegally paid to Morgan, Ozar and Dreiseszun controlled partnerships.

31. Specifically, on April 29, 1988, Executive Hills North transferred $925,000.00 to Morgan, Ozar and Dreiseszun partnerships ("April 1988 transaction"). This transfer created a negative balance in the Executive Hills North account which was offset by a disbursement of loan proceeds into the Executive Hills North account from Home Savings. The June 5 Affidavit concluded that Home Savings loan proceeds were paid to the benefit of Morgan, Ozar and Dreiseszun instead of being used for their proper purpose.

32. On July 12, 1988, Home Savings transferred $595,000.00 of Home Savings loan proceeds into the accounts of Executive Hills North and/or Ehney ("July 1988 transaction"). Meanwhile, on that same day, amounts totalling $1.1 million were transferred from Ehney's personal account to partnerships in which Morgan, Ozar and Dreiseszun had interests. The June 5 Affi-

davit, thus, clearly inferred that the proceeds of Home Savings construction loans to Executive Hills North and/or Ehney were illegally paid to Morgan, Ozar and Dreiseszun controlled partnerships for the benefit of those individuals by way of the April 1988 transaction and the July 1988 transaction.

### (i) The April 1988 Transaction

33. One of the ways in which defendants and Ehney made capital contributions to their various partnerships was by using capital disbursements received from other partnerships. This practice was not an unusual partnership accounting method and should have been understood as such by the FBI.

34. In April 1988, Ehney received a partnership distribution from Morgan partnerships in the amount of $925,000. This distribution was designed to be a "wash transaction," in that partners receiving the distribution would contribute that money back to other Morgan partnerships as capital contributions. Tr. [9/9/93] 101–02, DX 437, DX 457, DX 458.

35. The $925,000 partnership distribution was deposited into Executive Hills North's account and five checks totalling $924,999.20 were paid out of that account to other Morgan partnerships in which Ehney or Executive Hills North were partners.

36. When the checks from Executive Hills North to the other Morgan partnerships cleared Executive Hills North's account they created a substantial negative balance in that account. Tr. 1538–40, 1603; GX 86.

37. The existence of a negative balance in the Executive Hills North account represented an extension of credit to Executive Hills North by its bank. Tr. 1635.

38. At the same time those transactions occurred, Executive Hills North submitted a draw request of $1,065,240 to Home Savings in order to obtain a portion of the $26.95 million Executive Hills North construction loan. The request had attached pre-signed checks to vendors totalling $1,065,240, and further asked that Home Savings wire funds in that amount to Executive Hills North's account and then mail the checks to the payee vendors. Tr. 1533–35; GX 91.

39. Per this request, Home Savings wire transferred $1,065,240 to Executive Hills North's account. The deposit of these funds eliminated the negative balance in the Executive Hills North account and created a positive balance. Tr. 1538–41; GX 86.

40. OTS was aware the April 26, 1988 deposit of $925,000 to Executive Hills North's account represented a distribution from Morgan related partnerships. Further, the OTS was aware that the $924,999.20 in checks from the Executive Hills North account were written to the Morgan-related partnerships on the same day the distribution was deposited into the Executive Hills North account. Tr. 1628–1630, 1541–42.

41. Although the OTS criminal referral "suspected" that Morgan, Ozar and Dreiseszun knew that Ehney used Home Savings loan proceeds to "finance" his $925,000 capital contributions, absolutely no factual basis is presented in either the criminal referral or the June 5 Affidavit to support this suspicion.

### (ii) The July 1988 Transaction

42. Although more convoluted, the July 1988 transaction was essentially the same as the April 1988 transaction.

43. In July 1988, Ehney received a partnership distribution totalling $994,950. At the same time, Ehney borrowed $541,550. These two amounts, totalling $1,536,500, were deposited in Executive Hills North and/or Ehney's account. Tr. 1648, 1659–60, 1663; Tr. [9/9/93] 106–07; DX 438, DX 459, DX 461, DX 462, DX 466.

44. At the same time, pursuant to a draw request from Executive Hills North, Home Savings loan proceeds in the amount of $595,-758.51 were deposited into the Executive Hills North and/or Ehney account.

45. If the Home Savings loan proceeds of $595,758.51 had not been deposited into the Executive Hills North and/or Ehney account, that account would have had a negative balance. Tr. 1565, GX 87.

46. Home Savings had no reason to suspect that Executive Hills North would use the $595,758.51 in loan proceeds in any manner other than to pay contractors inasmuch as the required draw request was accompanied by contractors' invoices and unsigned checks in payment of those invoices. Tr. 1547–49.

### d. Findings of Fact Regarding the False Pars Lease Allegation in the June 5 Affidavit

47. The Home Savings decision to loan $26.95 million to Executive Hills North was based to a large extent on the existence of a lease of a significant amount of Executive Hills North building space to a tenant known as "Pars."

48. During the 1988 OTS examination of Home Savings, OTS discovered two different Pars leases in the file for the Executive Hills North loan, and requested an explanation. Home Savings called Ehney, who explained the initial lease as a mistake, and Home Savings reported Ehney's explanation to the OTS examiners. Tr. [9/3/93] 60–61; DX 429. OTS examiners then visited Executive Hills North and discovered a third lease which reflected the actual terms agreed to by Executive Hills North and Pars. This lease was less favorable to Executive Hills North than either of the other two leases in the Home Savings loan file.

49. After OTS and Home Savings were made aware of the third Pars lease, the president of Home Savings, Morgan, Ozar and Bridges attended a meeting at Executive Hills North, with Ehney and Grissom. A floor-by-floor inspection of the Pars building was conducted in order to determine the precise extent to which the building was actually occupied. Tr. [9/3/93] 71–78, [10/18/93 (a.m.) ] 15–19.

50. An FBI 302 report prepared to memorialize a March 13, 1991 interview of Grissom states that, at the meeting where the Pars lease was discussed, Morgan "commented that there was a tenant in the building and that there was no problem." GX 16 at 292. In addition, the notes of the FBI agents taken during an interview with Grissom reflect that Grissom explained to them that Morgan commented there was no problem because Pars would probably commit to leasing the remaining office space. Tr. 1182–84, 2149–50; DX 492 at 6. This information was not included in the June 5 Affidavit.

51. Paragraph 27 of the June 5 Affidavit stated that the Pars lease relied on by Home Savings in its loan decision was materially different than the lease actually entered into between Pars and Executive Hills North. The June 5 Affidavit further stated that when OTS questioned the president of Home Savings about this discrepancy he said that "Frank (Morgan) will talk to Ted (Ehney) about it (the lease) on Saturday."

52. The June 5 Affidavit, Paragraph 14(b) and (c), stated that shortly after this discussion, Grissom attended a Saturday morning meeting at M–D Management where Morgan, Ehney, Bridges and others discussed the Pars lease.

53. Paragraphs 10, 14(b), (c) and 27 of the June 5 Affidavit alleged that Morgan and Ehney were both involved in the submission of a "false" lease by Executive Hills North to Home Savings for purposes of obtaining a loan. The June 5 Affidavit further asserted that this topic was discussed at a Saturday morning meeting at M–D Management.

54. Paragraph 10 of the June 5 Affidavit stated that Grissom told the FBI that "Ehney revealed to him [Grissom] specific criminal activity regarding [Morgan, Dreiseszun, Ozar, Feingold, Bridges and Ehney] defrauding Home Savings through a false lease agreement provided to Home Savings in consideration for a loan." *See also* ¶¶ 14(b), 27 of the June 5 Affidavit.

55. The FBI, however, testified that the basis for the June 5 Affidavit's assertion that Morgan, Dreiseszun, Ozar, Feingold and Bridges were involved in a lease fraud were actually conclusions the FBI—not Ehney or Grissom—drew from the conduct of Morgan during and following the inspection of the Pars office space at Executive Hills North. Tr. 1886–88, 2134–35.

56. Rather than attributing the conclusion about Morgan's involvement in lease fraud to the FBI, the June 5 Affidavit characterized this conclusion as information supplied by Ehney through Grissom.

57. Grissom did not receive specific information that Morgan, or the other defendants, were involved in any false lease agreement

scheme and did not make that statement to the FBI. Tr. [10/18/93 (a.m.)] 22.

58. Grissom did not tell the FBI that it was his opinion that Morgan, Dreiseszun, Ozar, Feingold and Bridges were knowing participants in a lease fraud scheme. Tr. [10/18/93 (a.m.)] 22, 24–25, [10/19/93] 26.

59. Based on Findings Nos. 45 through 56, information in the possession of the FBI did not lead to the inference found in the June 5 Affidavit that the defendants were involved in the submission of a false lease by Executive Hills North to Home Savings for purposes of obtaining a loan.

**e. Findings of Fact Regarding the Kickback Allegation in the June 5 Affidavit**

60. Based upon information allegedly obtained from Ehney, Grissom told the FBI that Ehney and Bridges were required to give Morgan a 50% interest in every Ehney/Bridges project in exchange for financing from a Morgan-related bank. Grissom reported to the FBI that Ehney told him that "in exchange for obtaining loans ... Ehney and Bridges had to personally give Frank Morgan an ownership interest in the project when it was completed." Tr. 2125, Tr. [10/18/93 (a.m.)] 26–29.

**f. Findings of Fact Relating to the Information Regarding Saturday Morning Meetings Contained in the June 5 Affidavit**

61. The June 5 Affidavit stated, at Paragraph 44, that probable cause existed to believe that Morgan, Dreiseszun, Ozar, Bridges and Feingold met regularly at M–D Management on Saturday mornings to conduct or discuss illegal activity and would be likely to do so in the future. This information was based on statements from Randy Nay (identified in the June 5 Affidavit only as a confidential source ("CS")) and Grissom. Tr. 72–74.

62. The June 5 Affidavit concluded that since Bridges and Feingold both attended the Saturday meetings, those meetings must involve discussion of criminal activity because there was no other legitimate reason for both

of these individuals to attend the meetings at the same time.

63. Paragraph 44(b) of the June 5 Affidavit stated that "investigation has not disclosed Feingold to be a member of any of these partnerships," referring to Morgan/Dreiseszun/Ozar partnerships discussed in the OTS criminal referral. In fact, the FBI undertook *no* independent investigation to determine what interests Feingold had in any of the relevant partnerships.

64. As of June 5, 1991, public records demonstrated that Feingold was a partner in MT Investment Company and 100% owner of MD Associates # 3, both of which were partners in several of the Executive Hills/Morgan entities listed in the June 5 Affidavit. Tr. [9/9/93] 123–28; DX 514, DX 515A, DX 515B. Moreover, the OTS criminal referral identified Feingold as an owner of M–T Investment Company, as well as a partner in 8400 Partners and 8880 Ward Parkway, all of which were discussed in the June 5 Affidavit or the OTS criminal referral. Tr. 2539–44.

65. Paragraph 46(a) of the June 5 Affidavit described the Saturday meetings at M–D Management as "secret." Further, in describing the Saturday morning meetings, Paragraph 15(a) of the June 5 Affidavit stated that "CS" (Nay) told the FBI that Morgan, Dreiseszun and Ozar "do not divulge their banking secrets" beyond the group of "conspirators" listed in Paragraph 3 of the affidavit, and that "the content of [the Saturday meetings at M–D Management] is not disclosed to those outside of the group."

66. What Nay actually told the FBI agents was that confidential borrower information would not be disclosed to outsiders. Tr. [9/7/93] at 94.

67. Paragraph 15(b) of the June 5 Affidavit stated that Nay told the FBI that "on all major loans during 1985 to 1989 ... initial discussions would take place outside the financial institutions with Morgan, Ozar and Dreiseszun." Paragraph 15(b) of the June 5 Affidavit also attributes to Nay the inference that Home Savings's loan committee was a "rubber stamp" for Morgan, *see* Tr. 3407, by stating that "Morgan or the borrower would tell [Nay] that discussions had taken place

and a package needed to be put together for the loan committee approval."

68. What Nay actually told the FBI was that discussions concerning loans by Home Savings might occur at Saturday morning meetings and those discussions were always repeated and elaborated on at Home Savings where loan packages were put together. Tr. [9/7/93] 92–93, 96–97, 135, 142, Tr. 3406–07.

69. In response to FBI questioning as to why Home Savings board minutes showed no dissent with regard to loan packages presented to them, Nay stated that the loan packages presented to the board already had been through an initial winnowing process, and only those loans which the Home Savings' staff felt would be approved were ever actually presented to the board. Tr. [9/7/93] at 92–93.

70. Nay told the FBI that, on occasion, borrowers would tell Nay that Morgan had suggested they talk to Nay, or that Morgan would call ahead to Nay and indicate that a prospective borrower would be coming to Home Savings. On those occasions, Morgan did not instruct Nay to prepare the loan documents for execution, but would tell Nay to put together a loan package to see if the proposed loan was acceptable. Nay told the FBI that any Saturday morning discussions regarding loans were always repeated and elaborated on at Home Savings, that loan packages were put together based on discussions occurring at Home Savings, Tr. 3405–07, and that loans referred to Home Savings as a result of Saturday discussions would be subjected to the entire underwriting process, just as any other prospective loan. Tr. [9/7/93] 100–01, 105–08, 134–36, 151.

71. Paragraph 15(b) of the June 5 Affidavit stated that Nay was "not allowed to stay" at the Saturday meetings for discussions involving Home Savings, and that Nay was "dismissed" from the meetings prior to such discussions.

72. Nay, however, told the FBI, as reflected by the FBI report of that interview, that he "would conduct whatever bank business Morgan had asked him to attend [the Saturday morning meeting] for and then he would leave." GX 42, GX 43. Nay never

told the FBI that he had ever been "dismissed" from a Saturday morning meeting. Tr. 3397.

73. Nay further told the FBI that Morgan had done nothing wrong and that Nay did not believe that Morgan, Dreiseszun, or Ozar had committed bank fraud or any other illegal acts. Tr. 3387–89, Tr. [9/7/93] at 82–83. This information from the confidential source was not included in the June 5 Affidavit.

74. The June 5 Affidavit stated that Grissom told the FBI that he attended a Saturday meeting *at M–D Management* to specifically discuss the Pars lease matter. The sole basis for this statement was the April 13, 1991 FBI interview of Grissom. Tr. 2179. No written record or FBI 302 report was prepared of this interview. Furthermore, no written record of Grissom's statement that the Pars meeting occurred at M–D Management exists. The FBI interviewed Grissom on other occasions about the Pars lease for which written FBI 302 reports were prepared. Those FBI 302 reports do not reflect *any* statements by Grissom that any meeting to discuss the Pars lease occurred at M–D Management. Tr. 1199–1203; 2158–66; GX 15, GX 16, DX 407A 63–66; 169–70, 213–17.

75. Grissom and Gerhardt, the president of Home Savings, were the only two attendees of the Pars lease meeting to testify about the location of the meeting and they each testified that the meeting occurred, in its entirety, *at Executive Hills North,* not at M–D Management.

76. Based on Findings Nos. 47, 48, 72 and 73, the meeting referred to by Grissom at which Morgan, Ehney, Bridges and others discussed the PARS lease did not occur at the M–D Management offices.

## 2. Findings of Fact Regarding Ongoing Activity

### a. Findings of Fact Relating to the 127th & Antioch Property Information Included in the June 5 Affidavit

77. During the course of the Morgan investigation, the FBI became concerned that

7. The names "Adams" and "Cosgrove" refer to the owners of the 127th and Antioch property

the activity alleged in Paragraphs 10–27 of the June 5 affidavit was too stale to support the finding of probable cause necessary to secure a court order authorizing surveillance. With this concern in mind, the FBI asked Grissom for more current information about criminal activity involving the defendants. Tr. 822–23, 1305–10, 1957, 2400–01, 3422–26, Tr. [10/18/93 (am)] 48.

78. In response to the FBI's request for additional information, Grissom related information concerning property located at 127th and Antioch in Overland Park, Kansas which he thought Bridges might purchase. The FBI posed a hypothetical scenario in which Bridges would purchase that property in a transaction involving criminal activity similar to the "kickback" scheme alleged in the June 5 Affidavit and asked Grissom if, in his opinion, such a situation could occur. Grissom acknowledged that such a scenario *could* occur. Tr. [10/18/93 (am)] 53–55, [10/19/93] 57–59, 70–71.

79. With respect to the property at 127th & Antioch, Paragraph 28(b) of the June 5 Affidavit stated that:

ADAMS and COSGROVE[7] told GRISSOM that LARRY BRIDGES is going to be the new borrower on the property if they are forced out by MORGAN and BRIDGES will receive financing through a MORGAN financial institution. ADAMS further told GRISSOM that MORGAN has a viable tenant for the future finished development. Based on GRISSOM's prior experiences with TED EHNEY and LARRY BRIDGES, *GRISSOM believes that MORGAN will lend money to BRIDGES where there is a viable tenant for the development and MORGAN or a MORGAN partnership will receive an interest in the completed project.* When the property is developed, it will be made to appear that MORGAN purchased an ownership interest, when in reality it was given to him by BRIDGES [Emphasis added].

during the relevant period of time.

80. What Grissom actually told the FBI concerning the property was that he had heard rumors that the 127th & Antioch property *might* be available for purchase and that Bridges *might* have a potential tenant interested in the property. In response to the hypothetical posed by the FBI, Grissom speculated that the property *might* be foreclosed upon, that Bridges *might* buy the property, that he *might* borrow funds from a Morgan-related institution, and that the "kickback" scenario allegedly outlined by Ehney and described in Paragraph 14 of the June 5 affidavit *could* play out with respect to this property. Tr. 2403–04; Tr. [10/18/93 (am)] 54–55, [10/19/93] 57–59, 70–71.

81. Grissom had no actual knowledge of any illegal activity in connection with this proposed fictional transaction. Tr. [10/18/93 (am)] 59. Moreover, the FBI was aware that Grissom was no longer employed by Executive Hills North and no longer enjoyed any special access to current information with regard to Bridges' ongoing and future financial dealings.

### b. Findings of Fact Regarding the Standstill Agreement Referenced in the June 5 Affidavit

82. In April 1990, the $26.95 million Executive Hills North construction loan was in default and Home Savings took a deed in lieu of foreclosure which extinguished Executive Hills North's debt to Home Savings and Home Savings title to the property. Tr. 216–17. Home Savings then determined that Ehney's personal guaranty on the loan was uncollectible, but that Bridges' guaranty was collectible. Tr. [9/3/93] at 112.

83. One of the Executive Hills North buildings securing the loan was vacant and required substantial finishing cost before a tenant could occupy it. Tr. 862–64.

84. Recognizing that the value of Home Savings's newly acquired property could improve dramatically if it were leased and properly managed or sold, Home Savings entered into a "Standstill Agreement" with Bridges on April 10, 1990. Tr. [9/3/93] 112–13; DX 504.

85. Bridges, at that time, was engaged in the business of managing commercial property in the Kansas City area and was qualified to perform the services contemplated by the Standstill Agreement. Tr. 866.

86. The Standstill Agreement established $8,000,000 as an agreed-upon deficiency for which Bridges would be liable under his guaranty. The Standstill Agreement further limited Bridges' defenses in any suit to enforce the guaranty. The Standstill Agreement also called for Bridges to manage the building without compensation and attempt to lease it to a tenant. In exchange, Home Savings agreed to forego any attempt to enforce Bridges' guaranty for a period of two years. Tr. [9/3/93] 113–14, [9/7/93] 50–54; DX 504, DX 505.

87. If the building were leased, Home Savings' exposure accordingly would be reduced. Absent the Standstill Agreement, Home Savings would have had to pay for management services in order to lease the building. In addition, the Standstill Agreement preserved Home Savings' right to enforce Bridges' guaranty, limited Bridges' defenses in any suit to enforce his guaranty, and fixed the amount of Bridges' potential liability under his guaranty, thereby eliminating any need to litigate that issue in the event of a lawsuit. Tr. 353–54, 862–65, 869–70; Tr. [9/3/93] 113–14, 149, 156–57, [9/7/93] 7–8.

88. Although Paragraph 28(e) of the June 5 Affidavit stated that the OTS "discovered" the Standstill Agreement while reviewing the loan file, the OTS was informed of the Standstill Agreement at the time Home Savings entered into it. Upon learning of the Standstill Agreement, the OTS did not find it to be detrimental to the institution, and raised no objection to it at the time it was entered. Tr. 854, 874–75; Tr. [9/3/93] 115–16, 854–55, 871–73. This information was conspicuously omitted from the June 5 Affidavit.

89. The OTS informed the FBI that the Standstill Agreement benefited Home Savings, that it was not unusual for a financial institution to "work something out with [the] borrower" in this type of situation, and that Bridges could perform his obligations under the guaranty. Tr. 67, 321–22, 326, 354, 728–

30, 852, 860–61. This information additionally was not included in the June 5 Affidavit.

90. Paragraph 28(e) of the June 5 Affidavit stated that "[a]ccording to USERA [OTS examiner], if Home Savings sues BRIDGES [on his guaranty], this would place BRIDGES in a very precarious financial condition." This statement inferred that the Standstill Agreement was designed to forestall inquiry into Bridges' financial condition and partnership interests and was therefore a part of the criminal scheme alleged in the June 5 Affidavit. Tr. 731, 728–30, 852; GX 61.

91. In May, 1991, the OTS was unsure of the details of the financial condition of Bridges. Tr. 860.

92. Paragraph 28(e) of the June 5 Affidavit stated that the "Standstill Agreement" provided a continuing benefit to Morgan, Dreiseszun, Ozar and Bridges. The evidence shows that Home Savings had been taken over by federal regulators nearly three months *prior* to the date of the June 5 Affidavit. Tr. 2537. Furthermore, Bridges was terminated as manager of the property on May 15, 1991. Tr. [9/7/93] 225–30; DX 524. Finally, as of June 5, 1991, the FBI knew that the RTC was considering repudiating the "Standstill Agreement," Tr. 1210–11; Tr. [9/7/93] 227–29, and it was in fact terminated by the RTC on June 12, 1991. Tr. 227.

93. Paragraph 44(c) of the June 5 Affidavit stated that it is likely that "criminal discussions will continue at the Saturday meetings regarding … the refinancing of the $26.95 million loan discussed in Paragraphs 28(c) through (g)." At the time this statement was made, the FBI knew that Home Savings had been seized by the RTC on March 15, 1991; that the $26.95 million loan had been foreclosed in 1990 when Home Savings took over the Executive Hills North property (thus making refinancing impossible as of June 5, 1991, Tr. 2076–2078) that Bridges had been terminated as manager of the property on May 15, 1991; that the RTC was considering repudiating the Standstill Agreement; and that Bridges' earlier offer to buy the property had terminated on April 8, 1991 and that Bridges had not made any subsequent offers to buy the property.

## C. FINDINGS OF FACT REGARDING THE "NECESSITY" FOR COURT ORDERED ELECTRONIC SURVEILLANCE IN THIS INVESTIGATION

94. Although the June 5, 1991 Affidavit stated that the affiant had "participated in the investigation of the offenses set forth [t]herein since October 1989," the FBI investigation of Morgan, Ozar, Dreiseszun and Bridges did not really begin until early 1991 when the FBI received the OTS criminal referral. Tr. 2254.

95. After receiving advance notice from OTS that a criminal referral would be made concerning the defendants, Tr. 2279, 2282, 2294, but before actual receipt of the OTS criminal referral, the FBI conducted physical surveillance of Morgan on two occasions, Tr. 2284–85; DX 407A at 187–194, and prepared a background memorandum based in large part on a series of newspaper articles appearing in the *Kansas City Star* in March, 1990. Tr. 2286–88, 3464–66; GX 2–7; DX 407A at 195–204.

96. The FBI received the OTS criminal referral on February 12, 1991. Tr. 2294; GX 8. Between that date and April 18, 1991, the FBI's investigation of the potential offenses described in the June 5 Affidavit consisted of four interviews of Randy Nay, Tr. 2300–10, 2315–17, 2321–24, 2326–27, 2329–30; DX 407A at 210–11, DX 407A at 225; two interviews of Grissom, Tr. 2312–13, 2325; DX 407A at 213–17, DX 554C, DX 554D, DX 554E, and one attempted consensual monitoring of a conversation between Grissom and Bridges. Tr. 2325–26, 2328–29; DX 495.

97. At a meeting on April 18, 1991, the FBI decided to seek court authorization for electronic surveillance. Tr. 28–29, 154–55, 1851–54, 3307. Between this meeting and June 5, 1991, the FBI's investigative effort involved actions geared only to obtaining the electronic surveillance authorization.

98. Prior to the June 5 Affidavit, the FBI had not conducted any kind of a thorough review of the business records of defendants.

FBI agents testified that no business records were subpoenaed prior to the June 5 Affidavit because the FBI did not believe such records would show the full scope of the alleged conspiracy. Further, the FBI was concerned that a subpoena might tip off the defendants as to the existence of the investigation. Tr. 1988.

99. The FBI did not seek grand jury subpoenas for the records described in the OTS criminal referral because the OTS had already obtained those supporting records. Tr. 53.

100. In conducting its investigation prior to seeking court approval for electronic surveillance, the FBI chose not to interview a large number of available witnesses, including: Adams, Cosgrove, (who the June 5 Affidavit indicated had information concerning on-going criminal activity of defendants with respect to the property at 127th and Antioch); Larry Vohland (Executive Hills accountant); Sandra Funderburke (Executive Hills' accounting manager); Leland Gerhart (President of Home Savings); Larry McLenon (President of Valley View State Bank and a person who may have had information concerning any on-going criminal activity of defendants with respect to the property at 127th and Antioch); David Skidgel (an RTC attorney who may have had information concerning any on-going criminal activity of Bridges with respect to the Standstill Agreement); and assorted Federal Reserve Bank and FDIC regulators. Tr. 87–88, 1218, 1981, 2442–43, 2476, 3431–32.

## D. FINDINGS OF FACT REGARDING THE DEGREE OF MINIMIZATION OF INTERCEPTIONS EMPLOYED BY THE FBI DURING THE SURVEILLANCE IN THIS INVESTIGATION

101. Written minimization instructions provided to monitoring agents conducting video and audio surveillance at M–D Management provided:

> The Orders of the Court only authorize the interception ... of conversations and non-verbal conduct of [defendants] ... regarding offenses involving Title 18, United States Code, Sections 371 (Conspiracy),

1344 (Bank Fraud) and 2314 (Interstate transportation of stolen property).

> Agents may spot monitor for a reasonable period not to exceed two minutes to determine whether the subject is present and participating in a conversation. This spot monitoring may occur as often as is reasonable, but in any event at least one minute should elapse between interceptions.

> \* \* \* \* \* \*

> If the subject is engaged in conversation, interception may continue for a reasonable time, usually not in excess of two minutes, to determine whether the conversation contains criminal activities.

> If such a conversation is unclear but may be related to bank fraud, interstate transportation of stolen property or conspiracy involving these offenses, interception may continue until such time as it is determined that the conversation clearly no longer relates to that topic.

Tr. 2578–A, 2581–82, 2652; GX 89 ¶¶ 3, 5(a).

102. Monitoring agents generally adhered strictly to the "two minutes up and one minute down" minimization instruction. Tr. 2931, 3502.

103. The telephone minimization instructions set forth no specific monitoring parameters, but left the decision whether or when to suspend minimization to the discretion of the monitoring agents. Tr. 3089–90.

104. Prior to the initiation of the electronic surveillance, the FBI understood that the targets of the investigation routinely discussed highly sophisticated financial and real estate transactions. Tr. 2720–21. In the course of conducting surveillance, monitoring agents experienced difficulty in determining pertinent conversations from non-pertinent conversations, due to the simple fact that most of the surveillance involved, in some fashion, discussions of complex financing and real estate transactions. Tr. 3099. On numerous occasions, agents intercepted non-pertinent conversations for periods in excess of two minutes because they did not understand the substance of the conversations monitored or whether the conversation relat-

ed to the subject matter of their investigation.

105. With the exception of a briefing on the investigation and the nature of the transactions involved, monitoring agents received no special training prior to the commencement of the electronic surveillance to enable them to understand the monitored conversations and, thereby, discern between criminal and non-criminal conversations. Tr. 371–74, 451–53.

106. The complex nature of the discussions became evident on the very first day of monitoring. Tr. 2724. Agents who felt comfortable with their background in finance and real estate transactions at the start of the surveillance quickly concluded that the conversations involved highly sophisticated and complex financial transactions that were beyond their ready understanding. Tr. 2724.

107. To address the difficulties monitoring agents were experiencing in understanding the intercepted conversations, the FBI requested that the supervising Assistant United States Attorney extend spot monitoring period beyond two minutes. Tr. 364–71, 2573, 2580–81. This request was refused. Tr. 364–73, 2580–81.

108. Because the monitoring agents did not understand the nature of the conversations being intercepted, agents intercepted many privileged, and non-pertinent conversations. Many of these "innocent" conversations were intercepted for periods in excess of two minutes. Tr. 2649.

109. Wiretaps were in place on five telephone lines at M–D Management from September 27, 1991 through November 23, 1991. Tr. 3095. With respect to these telephone wiretaps, a total of 8126 minutes were intercepted. Of this total, the number of minutes of pertinent conversations was 223, or, in other words, only 2.75% of the total calls were deemed to be pertinent. Tr. 3155; GX 120.

110. The agents relied on Paragraph 5(a) of the written minimization instructions as justification for monitoring conversations for periods in excess of two minutes. Tr. 2844–45. Monitoring agents testified that they believed the language of Paragraph 5(a) al-

lowed them to monitor for more than two minutes any time they did not understand the substance of a conversation, rather than only when it was "unclear" as to whether criminal activity was being discussed. Tr. 2844–45. For example, monitoring agents testified that interception could extend beyond two minutes to determine if the conversation was criminal anytime the conversation was about "bank type stuff." Tr. 2844–45.

111. Prior to the commencement of electronic surveillance at M–D Management, the FBI was aware of the potential for the interception of attorney-client privileged communications inasmuch as the FBI fully anticipated that Morgan and his business associates were then represented by attorneys. Tr. 1458.

112. Prior to the commencement of electronic surveillance, there were no discussions among the monitoring agents concerning the identity of any attorneys who may have been representing the targets. Tr. 2585.

113. During the monitoring, FBI agents discussed concerns about intercepting attorney-client conversations and there were specific discussions about the fact that so many of the conversations intercepted involved attorneys. Tr. 1064.

114. The minimization instructions given to FBI agents monitoring the video and audio surveillance provided:

No conversation may be intercepted that would fall under any legal privilege ... described below:

Attorney–Client Privilege:

Never knowingly listen to or record a conversation between a subject and his or her attorney when other parties are not present. If it is determined that a conversation involving an attorney constitutes legal consultation of any kind, notify the case agent, shut off the monitor and stop recording, unless you are able to determine from the interception of any conversation involving an attorney that third parties who are not in-

volved in the legal matters being discussed are present. . . .

Tr. 1451; GX 89 ¶ 7.

115. Monitoring agents understood these instructions to mean that, even if an attorney was present during a conversation and legal matters were being discussed, agents were permitted to spot monitor the conversation pursuant to the two minutes up and one minute down instruction. Tr. 2893–95.

116. The FBI claimed that June 21, 1991 was the earliest date by which they knew R.J. Campbell was an attorney representing Morgan, Ozar and Dreiseszun.

117. On June 6, 1991, and June 13, 1991, newspaper articles discussing the an FBI investigation of Morgan appeared in the *Kansas City Star*. These articles expressly identified R.J. Campbell as an attorney representing Morgan. These articles were placed in the FBI files relating to the investigation of defendants. DX 480, DX 538, DX 539, DX 540, DX 541.

118. On Saturday, June 15, 1991, the FBI intercepted a conversation involving R.J. Campbell and Morgan. DX 406A. This conversation was monitored for approximately 38 minutes. Furthermore, at one point, this conversation was intercepted for over 31 minutes without minimization. GX 85A; DX 406A. Based on the substance of this conversation, it unambiguously appeared that Campbell was an attorney representing Morgan and that legal matters were being discussed. DX 406A.

119. On June 17, 1991, FBI agents appeared before the issuing federal district court to present their first 10–day report to the court. During this meeting the district judge expressly advised the FBI agents that R.J. Campbell was an attorney. Tr. 3358, 3507–09.

120. On June 21, 1991, FBI agents attempted to serve a grand jury subpoena on Mark Morgan at the offices of M–D Management. Tr. 3518; DX 407B at 430–31. In response, R.J. Campbell contacted the FBI on June 21, 1991 and spoke with an FBI agent. During that telephone conversation, Campbell advised the FBI that he represented Frank Morgan. In response to direct questions by the FBI agent concerning whether Campbell represented Mark Morgan, Dreiseszun, and Ozar, Campbell stated that he also represented those individuals. DX 407B at 430. The FBI agent did not ask Campbell whether his legal representation extended to Larry Bridges, David Feingold or any other persons. Tr. 2815–19; DX 407B at 430–31.

121. Following this conversation, monitoring agents were advised that conversations involving Campbell were not to be monitored unless they could determine through "spot-checks" that criminal activity was being discussed or if a third-party not known to be represented by Campbell was present. Tr. 2589, 2895–96; GX 83 at 518.

122. Even though the FBI knew that R.J. Campbell was an attorney who represented Frank Morgan and at least two other named targets of the investigation, the FBI monitored a conversation in which Campbell was a participant on June 22, 1991. GX 85A; DX 406N. This conversation clearly involved legal matters and lasted approximately 55 minutes. GX 85A; DX 405K; DX 406N.

123. The FBI's reason for monitoring this conversation was that third-parties not known to be represented by Campbell—Tom Morgan and Larry Bridges—were present. Tr. 3513–14; GX 83 at 3. During the June 21, 1991 telephone conversation with the FBI, Campbell had not been asked by the FBI agent whether he represented Tom Morgan and Larry Bridges. This inquiry was not made despite the fact that Bridges was a target of the investigation and Tom Morgan was defendant Morgan's son and Campbell had advised the FBI that he represented Morgan's other son, Mark Morgan. When Campbell was ultimately informed that Bridges and Feingold were targets of the investigation, he immediately advised the Government that he represented both individuals. Tr. at 2819–20; GX 83 at 3–4.

124. Even though the FBI made no independent effort to determine who Campbell represented, unless Campbell had formally and personally advised the Government of the existence of an attorney-client relationship between himself and all others present

for a particular conversation, the monitoring agents proceeded on the assumption that no attorney/client relationship existed. Tr. 2820, 3514–15.

125. A subsequent affidavit, in support of the extension of the electronic surveillance at M–D Management, alleged that there was probable cause to believe that Campbell was involved in criminal conversations with Morgan and the other targets of the investigation. GX 99. Based on this affidavit, the issuing federal district court named Campbell as an additional subject of the electronic surveillance and authorized the FBI to monitor conversations to which Campbell was a party. DX 401J, 401L.

126. The underlying basis for the allegations against Campbell stemmed from part of the conversation between Campbell and Morgan monitored by the FBI on June 15 during which the FBI believed Campbell and Morgan were discussing an illegal loan transaction. GX 99 ¶ 31. In this particular conversation Campbell and Morgan were discussing financing a loan on a property that was subject to a "wrap mortgage."

127. The term "wrap mortgage" does not appear in the affidavit submitted to the Court seeking to add Campbell as an interceptee, (GX 99) because the FBI did not consider the use of the term "wrap mortgage" to be pertinent to the conversation. In that conversation, Campbell referred to the transaction as a "tricky loan" and indicated that "the borrower is not the owner." These statements led the FBI to believe that the transaction Campbell and Morgan were discussing was the same type as those discussed in the June 5 Affidavit. Tr. 2032–33.

128. A "wrap mortgage" is a real estate term of art describing a transaction in which the seller of property does not pay off the mortgage, but retains the obligation to do so. As a result, a person seeking to borrow funds to pay off a "wrap mortgage" would not be the owner of the property.

129. In making the affidavit seeking to add Campbell as a named interceptee, the affiant did not know or understand the meaning of the term "wrap mortgage." Tr. 2454, 2458–59.

130. Because no conversations involving criminal activity on the part of Campbell were intercepted during the following 30 days that he was a subject of the electronic surveillance, Campbell was dropped as a named interceptee when the electronic surveillance was extended on August 2, 1991. Tr. 2594–95.

131. On June 22, 1991, the FBI intercepted a conversation between attorney Anthony Luppino, Frank Morgan, Sherman Dreiseszun, and David Feingold. GX 85–A; DX 405K. During this conversation, Luppino explained the tax implications of various transactions and the optimum way to structure a transaction for tax purposes. DX 406L. The conversation with Luppino lasted approximately 55 minutes, with approximately 50 minutes being intercepted. GX 85A. The substance of this conversation gave a strong indication that Luppino was an attorney and that legal matters were being discussed.

132. The monitoring agent who intercepted this conversation testified that there was no apparent criminality involved in this conversation. Nonetheless, the agent thought the conversation might be pertinent. Tr. 3485–86, 3489–90.

133. After intercepting this conversation, the FBI took no steps to determine Luppino's identity because it assumed him to be an accountant. Tr. 3490–91. On the following Saturday, June 29, 1991, several minutes of another conversation involving Luppino were intercepted. Tr. 3496–97; GX 85A.

134. The FBI intercepted another conversation involving Luppino on July 13, 1991. GX 111. At one point, this conversation was monitored for 19 minutes without interruption. Tr. 3497; GX 85A. A subsequent 10–day report filed with the authorizing court on July 24, 1991 (a date by which the Government concedes it knew Luppino to be an attorney) completely failed to mention this interception. Monitoring agents testified that they were instructed not to include this conversation in the 10–day report in order to preserve its attorney/client confidentiality. Tr. 3499. However, other attorney-client conversations were summarized in subsequent 10–day reports. Tr. 3500.

135. On August 3, 1991, the FBI intercepted a conversation between Luppino, Morgan, and Feingold. GX 85A; DX 405G, 406E. The conversation lasted approximately 6 minutes and the FBI intercepted approximately 4 minutes and 10 seconds. GX 85A; DX 405E.

136. At the time of the August 3, 1991 conversation, the FBI knew Luppino to be an attorney who represented subjects of the investigation. After learning that Luppino was involved in the conversation, the FBI nonetheless continued to monitor the discussion for a two minute periods, followed by a one minute shut down period, followed by another two minute period. GX 85A. The monitoring agent testified that he monitored this conversation because the word "KPERS" was mentioned. Tr. 2920–21.

137. On August 10, 1991, the FBI intercepted a conversation between Luppino, Morgan, and Dreiseszun. On this date, the FBI knew that Luppino represented both Morgan and Dreiseszun. Tr. 2906; DX 406F. The conversation with Luppino lasted approximately 13 minutes, of which the FBI intercepted 7 minutes and 48 seconds. GX 85A; DX 405H. During the conversation, Luppino discussed various alternatives for structuring a particular financial transaction.

138. On or about September 14, 1991, FBI monitoring agents received instruction that from that point forward attorney-client conversations should only be "spot monitored" for a maximum of 15 seconds.

139. On October 19, 1991, the FBI intercepted a conversation between Luppino, Morgan, and Dreiseszun. The conversation lasted approximately 41 minutes and the FBI intercepted approximately 37 minutes. GX 85A. During this conversation, Luppino discussed the "German deal." DX 406M.

140. On October 26, 1991, the FBI intercepted yet another conversation between Luppino, Morgan, and Dreiseszun. DX 406J. This conversation lasted approximately 8 minutes with the FBI intercepting 6 minutes. Tr. 3003–4; GX 85A.

141. On November 22, 1991, the FBI intercepted a conversation between Jack Fingerish (an attorney and partner of Camp-

bell), Campbell, Morgan and another attorney. The conversation lasted approximately sixty-five minutes. GX 85A. Although the FBI minimized this conversation on several occasions, a substantial portion of the conversation was nonetheless monitored.

142. The FBI reported this conversation to the federal district court because Campbell was discussing a grand jury investigation with Morgan. The FBI viewed this discussion as potentially involving obstruction of justice. Tr. 2873–74.

143. On December 6, 1991, the FBI intercepted a conversation between Campbell, Morgan and Dreiseszun. DX 406B. A significant portion of this conversation was monitored and it involved discussions about the FBI investigation and communications between Campbell and the U.S. Attorney's office. GX 85A; DX 406B.

144. In addition to the conversations described above, several other conversations involving attorneys were intercepted. For example, on September 16, 19, 25 and 27, additional conversations involving Anthony Luppino were monitored for more than 15 seconds. GX 85A. On October 1, 2, 4, 5, 11, 12, 19 and 26, conversations involving Campbell and Luppino were intercepted. In most of these instances, the interceptions lasted more than 15 seconds. On November 2, 1991, the FBI intercepted communications involving Luppino on numerous occasions for periods approaching two minutes. GX 85A. On November 4, 6, 9, 11, 12, 16, 20, 21, 22, 23, 25, 27 and 30, conversations involving attorneys were monitored for periods in excess of 15 seconds. GX 85A.

145. During his testimony, the FBI agent in charge of supervising the telephone wiretap described his understanding of the procedures that should be followed when it is discovered that an attorney is a participant in an intercepted conversation. This agent's testimony stood in stark contrast to the manner in which attorney-client conversations generally were treated throughout the M–D Management surveillance. The agent testified that he instructed all of the telephone monitors that an interception was to be terminated immediately if an attorney was en-

gaged in the conversation. Specifically, the agent testified that he told the monitors "if you know you have an attorney on the line, you get out [of the call]. I don't care what the conversation is. Get out." Tr. 3094.

## II. Proposed Conclusions of Law

After hearing the testimony of witnesses, reviewing the evidence and considering the applicable law, the Court concludes:

1) The June 5 Affidavit failed to state probable cause to believe that the defendants were engaging in or discussing criminal activity during the Saturday morning meetings at M–D Management in June of 1991;

2) To the extent that the June 5 Affidavit did make a showing of probable cause that defendants had engaged in criminal activity, such a showing was stale as it allegedly related to Saturday morning meetings in June of 1991;

3) The finding by the issuing federal district court that the necessity requirement of Title III, 18 U.S.C. § 2518(3) had been satisfied was not clearly erroneous; and

4) Finally, the United States failed to adequately and reasonably minimize the electronic surveillance conducted in this case as required by 18 U.S.C. § 2518(5).

## A. CONCLUSIONS OF LAW REGARDING THE EXISTENCE OF PROBABLE CAUSE IN THE JUNE 5 AFFIDAVIT

■ An application for authority to conduct electronic surveillance must include "ample facts" establishing probable cause to believe: (1) that an individual has committed or is about to commit a particular offense; (2) that the facilities from which communications are to be intercepted are being used in connection with the commission of that offense; and (3) that electronic surveillance will therefore result in interception of communications related to the offense. 18 U.S.C. § 2518(3); *United States v. Leisure,* 844 F.2d 1347, 1354 (8th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); *United States v. Biaggi,* 853 F.2d 89, 95 (2d Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).

■ While "probable cause" is no different in the context of electronic surveillance than in other Fourth Amendment contexts, *see, e.g., United States v. Macklin,* 902 F.2d 1320, 1324 (8th Cir.1990), *cert. denied,* 498 U.S. 1031, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991), the intrusion inherent in electronic surveillance requires a careful application of the concept of probable cause. *Berger v. New York,* 388 U.S. 41, 56, 87 S.Ct. 1873, 1882, 18 L.Ed.2d 1040 (1967); *see also, id.* at 69, 87 S.Ct. at 1888 (Stewart, J. concurring) ("[o]nly the most precise and rigorous standard of probable cause should justify an intrusion of this sort").

■ The narrow question presented to this Court is whether the June 5 Affidavit sufficiently stated probable cause to believe that the defendants were engaging in or discussing criminal activity during their Saturday morning meetings at M–D Management in June of 1991. This question requires that the Court consider only the information contained in the June 5 Affidavit and the information available to the FBI at the time the June 5 Affidavit was presented to the issuing federal district court.

At the hearing in this case, the Court heard a good deal of evidence that was collateral to the narrow issue to be decided. Whether the probable cause requirement was satisfied is to be judged by what information was in the June 5 Affidavit, the extent that information was fairly and accurately presented to the issuing court, and the total information available to the FBI at the time. The ultimate ability of the Government to prove (or the defendants to disprove) the factual allegations in the June 5 Affidavit is not relevant to the issue this Court must decide.

The seminal case of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), provides the standard an issuing court must follow in determining whether probable cause supports an application for electronic surveillance and, consequently, the duty of the reviewing court when considering the propriety of that determination.

The task of the issuing magistrate is simply to make a practical, common sense

decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis" for ... conclud[ing] that probable cause existed.

*Id.* (citations omitted).

In this case, a mere facial examination of the June 5 Affidavit might lead to the conclusion that it stated sufficient facts to show probable cause that defendants were engaging in criminal activity. However, such a conclusion would assume that the issuing court was given "[s]ufficient information to allow [it] to determine probable cause [because its] action cannot be a mere ratification of the bare conclusions of others." *Id.* Serious questions exist as to whether the FBI fairly and accurately presented information in the June 5 Affidavit to the issuing court and whether the FBI included all of the material information available to it on June 5, 1991.

■ "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164–65, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978) (emphasis in original). If it is established, by a preponderance of the evidence, that the allegations in an affidavit were false or reckless, the affidavit's false or reckless materials must be set aside, and if the affidavit, as redacted, is insufficient to establish probable cause, the warrant must be voided and its fruits suppressed. *Franks, supra*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85; *United States v. Jacobs*, 986 F.2d 1231, 1234 (8th Cir.1993).

■ Under *Franks,* the "relevant inquiry is whether the warrant affiant knowingly, deliberately or recklessly included false statements in the warrant affidavit." *United States v. Olderbak*, 961 F.2d 756, 760 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 422, 121 L.Ed.2d 344 (1992), (emphasis omitted). In making this inquiry, the Court must

bear in mind the Government's obligation of candor when dealing with the issuing court and its responsibility to bring information to the court's attention which may undermine a showing of probable cause. *Jacobs*, 986 F.2d at 1235.

■ If a warrant affidavit contains a false statement, which was made knowingly and intentionally, or with reckless disregard for the truth, and the false statement was necessary to the finding of probable cause, then the warrant is invalid. *United States v. Johnson*, 925 F.2d 1115, 1117 (8th Cir.1991); *Franks v. Delaware*, 438 U.S. at 155–56, 98 S.Ct. at 2676. However,

... completely innocent misrepresentation should not support suppression even if material. The primary justification for the exclusionary rule is to deter police misconduct. Furthermore, if the officer reasonably believes facts which facially indicate a crime has been committed, then even if mistaken, he has probable cause for believing a crime has been committed.

*United States v. Marihart*, 492 F.2d 897, 900, n. 4 (8th Cir.), *cert. denied,* 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974), (citation omitted).

■ A facially sufficient affidavit may be challenged if it includes deliberate or reckless falsehoods, *Franks v. Delaware*, 438 U.S. at 154, 98 S.Ct. at 2675; *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir.1986), and if the affidavit is the subject of deliberate or reckless omissions of material facts. *Id.* See, e.g., *United States v. Dennis*, 625 F.2d 782, 791 (8th Cir.1980). The same analytical process used to determine whether an affidavit contains a material falsehood is used to determine whether an omission will vitiate a warrant affidavit under *Franks*. *United States v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986); *United States v. Dennis*, 625 F.2d at 791–92; *United States v. House*, 604 F.2d 1135, 1141 n. 9 (8th Cir.1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980).

■ Adapting the *Franks* guidelines to material omissions from affidavits, it must be shown that (1) the police omitted facts with the intent to make, or in reckless disregard of whether it made, the affidavit misleading, and (2) that the affidavit, if supplemented by

the omitted information, would not have been sufficient to support a finding of probable cause. *United States v. Flagg,* 919 F.2d 499, 500 (8th Cir.1990), (quoting *United States v. Reivich,* 793 F.2d at 961); *cf. Franks v. Delaware,* 438 U.S. at 155–56, 98 S.Ct. at 2676. Recklessness can be inferred from the omission of material information from an affidavit. *Reivich,* 793 F.2d at 961. Such an inference, however, is warranted only when the material omitted would have been "clearly critical" to the finding of probable cause. The failure to include information in an affidavit does not constitute a false statement within the contemplation of *Franks* if the omission was not intended to enhance the contents of the affidavit, but rather was omitted for some legitimate purpose, such as to protect an informant. *United States v. Strini,* 658 F.2d 593, 597 (8th Cir.1981). Suppression is warranted only if the affidavit, as supplemented by the omitted material, could not have supported the existence of probable cause. *United States v. Reivich,* 793 F.2d at 962; *United States v. Lueth,* 807 F.2d at 726.

██ The evidence in this case shows the June 5 Affidavit, while sufficient on its face, contains a disturbing pattern of misstatements, omissions and overstatements which ultimately undermine the showing of probable cause. These misstatements, omissions and overstatements, when considered individually might not warrant a conclusion that they were recklessly included in or omitted from the June 5 Affidavit. However, when taken together, the conduct shows a pattern of overreaching which put the facts that were known to the FBI in a light most favorable to the conclusion the FBI wanted the issuing court to reach. This pattern of conduct was reckless and eventually misled the issuing court to make a finding of probable cause when a fair and accurate presentation of the facts available to the FBI would not have led to that conclusion.

### 1. CONCLUSIONS OF LAW REGARDING HISTORICAL ACTIVITY

#### a. Conclusions of Law Regarding the One Petticoat Lane Transaction Referenced in the June 5 Affidavit

The first historical transaction discussed in the June 5 Affidavit was the One Petticoat

Lane loan that Executive Hills received from Home Savings in 1987. The significance of this transaction, as described in the June 5 Affidavit, was two-fold. First, the transaction represented a loan from Home Savings to Executive Hills for a project that was built on land in which defendants had an ownership interest at a time when some of them were serving on the Board of Directors of Home Savings. This conduct constituted a regulatory violation and a potential criminal violation because defendants did not disclose to Home Savings their ownership interest in the land at the time the loan was made. Second, disbursements from the Home Savings loan went into the bank account for the One Kansas City Place project which was jointly controlled by defendants and Executive Hills. The inference in the June 5 Affidavit was that the loan proceeds were diverted to the benefit of defendants instead of being used by Executive Hills for their intended purpose, i.e., construction of the One Petticoat Lane project.

With respect to the ownership of the land on which One Petticoat Lane was ultimately built, the June 5 Affidavit does state probable cause to believe that a regulatory violation occurred at the time the loan was made to Executive Hills. However, the weight this conclusion should be afforded in a probable cause determination is questionable. The OTS criminal referral, which provided the sole basis for information about this transaction, concluded that the regulatory violation would only be a "serious regulatory violation" if there was evidence that proceeds from the Home Savings loan had been used by Executive Hills to purchase the land in which defendants had an ownership interest. Although this transaction occurred in 1987, four years before the June 5 Affidavit, neither the June 5 Affidavit nor the OTS criminal referral contained any evidence that proceeds from the Home Savings loan had been used by Executive Hills to purchase the land.

While the issuing court was informed that a "serious regulatory violation" had occurred, the court was not told that this conclusion depended upon evidence that Home Savings

loan proceeds had been used to purchase the land. The absence of that evidence, four years after the transaction occurred, was clearly critical for the issuing court to know so that it could assess, for itself, the importance of the regulatory violation. Additionally, although the June 5 Affidavit concludes that this regulatory violation indicated a possible bank fraud, no factual basis for this conclusion was given. Unless it could provide more factual support, the Affidavit's conclusion that possible bank fraud was indicated overstated the significance of a violation of a civil banking regulation. *See e.g. United States v. Christo,* 614 F.2d 486, 492 (5th Cir.1980) (violation of a civil banking regulation must be accompanied by intent for the violation to be considered criminal); *United States v. Wolf,* 820 F.2d 1499 (9th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988). The failure to provide the issuing court with critical information about the relative importance of the regulatory violation and the failure of the affidavit to provide a factual basis for concluding that the regulatory violation indicated possible bank fraud misled the issuing court into placing more importance on this transaction than was warranted.

With respect to the deposit of proceeds from the Home Savings loan into the One Kansas City Place account, the June 5 Affidavit inferred that the loan proceeds were diverted from their authorized use to the unauthorized and improper benefit of defendants. The Affidavit concludes this activity indicated possible bank fraud on the part of the defendants. The characterization of this transaction was overstated and misled the issuing court.

The June 5 Affidavit attributes to the OTS criminal referral the conclusion that there was no documentation as to the ultimate recipient of the Home Savings loan proceeds deposited into the One Kansas City Place account. However, the conclusion actually reached by the OTS was materially different. The OTS criminal referral stated that the records it had obtained did not cover the time period when the loan proceeds would have been disbursed from the One Kansas City Place account. Therefore, according to the OTS it had not *yet* identified the ultimate recipient of the loan proceeds.

The failure of the OTS to obtain appropriate records which might have shown the ultimate recipient of the loan proceeds is significantly different than saying there was no documentation showing the ultimate recipient of the proceeds. The absence of documentation in a loan transaction where documentation should exist normally leads to the unmistakable inference that something is amiss. It plainly appears this is the inference the FBI wanted the issuing court to draw. However, in fact, the OTS did not know if documentation of the ultimate recipient of the loan proceeds existed because it had not yet obtained those records. At the time the June 5 Affidavit was presented to the issuing court, the FBI likewise was unaware of whether those records, when obtained, would have helped or hurt its position. Further, even though the OTS acknowledged that it did not have the information necessary to draw the conclusion that no documentation existed as to the ultimate recipient of the loan proceeds, the FBI conducted no independent investigation before it included that very conclusion in the June 5 Affidavit.

It is also important to note that, even though the OTS criminal referral reported it did not have the proper records to determine who were the ultimate recipients of the loan proceeds, the OTS also reported that it *did* have information from Home Savings' files which indicated that the loan proceeds were used to pay contractors on the One Petticoat Lane project, i.e., the proceeds were used for their intended purpose. This information, clearly contrary to an inference that defendants benefitted from the Home Savings loan proceeds, was not in the June 5 Affidavit and was not provided to the issuing court. Finally, information included in the OTS criminal referral that the One Petticoat Lane loan was paid in full by Executive Hills, the borrower, was absent from the June 5 Affidavit. Had the June 5 Affidavit contained a complete and accurate picture of the Home Savings loan on the One Petticoat Lane project, it would not have supported probable cause to believe that defendants had engaged in bank

fraud with respect to this loan or that they had diverted loan proceeds for their own benefit. The failure to provide this information was reckless and misled the issuing court.

**b. Conclusions of Law Regarding the Metro North Loans to Bridges Referenced in the June 5 Affidavit**

A series of loans from Metro North to Bridges was used in the June 5 Affidavit to support the conclusion that large parts of the proceeds of these loans were improperly disbursed to partnerships in which defendants had interests. The June 5 Affidavit refers to $49 million dollars in loans made by Metro North to Bridges. In fact, even though Metro North did loan Bridges an aggregate of $49 million over the period of time involved, varying repayments and refinancing of those loans meant that the largest amount that Metro North ever had outstanding to Bridges was $19 million. However, the manner in which this information was presented in the June 5 Affidavit could easily have led the issuing court to assume that Metro North had $49 million in outstanding loans to Bridges. While this discrepancy is not itself material, it is indicative of a pattern in the June 5 Affidavit of pushing the facts to their limit, and sometimes beyond, in an effort to cast the facts in the light most favorable to the ultimate objectives of the FBI.

The June 5 Affidavit sufficiently recounts information about the Metro North loans as they were presented in the OTS criminal referral. The troubling aspect of this portion of the June 5 Affidavit is that it omits material information about the reviews conducted by the FRB and the FDIC of these loans. Both of these regulatory agencies reviewed the same Metro North loans in question and, while the FRB wrote up a civil regulatory violation based upon a technical, inadvertent violation, neither agency made these loans the subject of a criminal referral or assessed civil fines. The fact that the FRB and FDIC may have reached a different conclusion about the significance of the Metro North loans to Bridges does not make those agencies right and the OTS wrong. However, for the FBI to only present the views of the OTS on this issue denied the issuing court information critical to its assessment of the credibility of the OTS conclusions about the Metro North loans. At the hearing, the reason given by the FBI for omitting this information from the June 5 Affidavit was that the OTS had information in its possession which the FRB and FDIC did not have, and thus, the conclusions of the OTS were more accurate. Whether conclusions about the Metro North loans to Bridges reached by the OTS were more accurate than those previously reached by the FRB and FDIC was a decision for the issuing court to make, not the FBI. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Additionally, with respect to these loans, the June 5 Affidavit states that a portion of the loans were repaid from a certificate of deposit owned by Bridges and that the source of the funds for this certificate of deposit was "questionable." First, there was no factual basis in the June 5 Affidavit supporting the conclusion that the source of the funds was "questionable." Second, all the OTS criminal referral actually said about these funds was that their source was "unknown." The difference between the words "questionable" and "unknown" in an affidavit alleging bank fraud is as obvious now as it should have been to the FBI at the time the June 5 Affidavit was prepared. The term "questionable" undoubtedly infers illegality, while the term "unknown" infers lack of information. This discrepancy, considered in isolation, is not fatal. It is, though, probative of a pattern of misstatement and overstatement in the June 5 Affidavit designed to lead the issuing court to mistakenly conclude there was probable cause to believe defendants were involved in criminal activity.

**c. Conclusions of Law Regarding the $26 Million Loan from Home Savings to Executive Hills North Referenced in the June 5 Affidavit**

Two loan disbursements from a construction loan made by Home Savings to Executive Hills North served as the basis for the conclusion in the June 5 Affidavit that Ehney and Executive Hills North paid loan proceeds to defendants instead of using them for their

intended purpose. The essence of these transactions, as described in the June 5 Affidavit, was that disbursements were made from the Home Savings loan to the Executive Hills North account. These disbursements then were paid out by Ehney to partnerships in which defendants had interests instead of being used for their intended purpose, i.e., paying construction contractors on Executive Hills North projects. The conclusion that these loan proceeds were paid by Ehney to partnerships controlled by defendants was made following an analysis of the Executive Hill North bank records and related personal bank accounts of Ehney. This analysis merely showed that Home Savings loan proceeds went into Executive Hills North accounts and payments from Executive Hills North accounts were made to partnerships in which defendants were involved. From these transactions, the June 5 Affidavit concluded that proceeds of Home Savings loans to Executive Hills North were illegally paid to defendants.

The June 5 Affidavit neglected to say that bank records of Executive Hills North and Ehney also showed deposits into these accounts from sources other than the Home Savings loan proceeds. These other deposits were in virtually identical amounts as the payments to the partnerships in which the defendants were involved. However, any information concerning these other deposits was not included in the June 5 Affidavit despite the fact that such information was critical in assessing whether the source of payments to the defendants' partnerships was Home Savings loan proceeds.

The defendants and Ehney were partners in a large number of partnerships. In funding these partnerships, the defendants and Ehney would use capital distributions from one partnership to fund capital contributions for other partnerships. This practice, when applied to the deposit of funds into Executive Hills North accounts (representing partnership distributions) and virtually matching payments from those accounts to other partnerships (representing capital contributions), provides a ready explanation for the transactions the FBI found so suspicious. This information may not conclusively establish

that partnership distributions, and not Home Savings loan proceeds, were used by Ehney and Executive Hills North to fund payments to the defendants' partnerships, but it certainly was critical information that the issuing court should have been provided so as to make its own judgment about these loan transactions. The issuing court was not provided with this information, instead, the June 5 Affidavit simply provided the issuing court with a snapshot of the Ehney and Executive Hills North bank records—a snapshot that does not accurately or fairly portray the entire picture.

In concluding that the Home Savings loan proceeds were inappropriately paid to defendants' partnerships, the June 5 Affidavit noted that, at the time the loan proceeds were deposited in Executive Hills North accounts, those accounts had negative balances which were caused by the payments to defendants' partnerships. The June 5 Affidavit reasoned that since Home Savings loan proceeds had covered these negative balances in the Executive Hills North accounts, the loan proceeds had benefited defendants. The more likely conclusion from these facts was that Executive Hills North's bank extended credit to Executive Hills North by covering the overdraft caused by payments to the defendants' partnerships. Furthermore, if the Home Savings loan proceeds restored the account balances from negative balances to positive balances, the benefit inured to the bank rather than defendants.

Information about these loans in the June 5 Affidavit was sufficient to infer that Ehney, the sole owner of Executive Hill North, had used Home Savings loan proceeds to cover negative balances in the Executive Hills North account. However, this conduct of Ehney, who was not a named interceptee of the electronic surveillance on a subject matter of this investigation, is not evidence of criminal activity on the part of defendants absent some showing that defendants knew of or discussed Ehney's actions. In this regard, there was no evidence of such knowledge in the June 5 Affidavit. In fact, the files of Home Savings, of which defendants Morgan, Ozar and Dreiseszun were board members, show that the draw requests for

these loan proceeds by Ehney were supported by contractor invoices in the amount of the draws requested. This information was not provided to the issuing court in the June 5 Affidavit. If the issuing court had been provided this information, it might have concluded there was probable cause to believe that Ehney was illegally diverting the Home Savings loan proceeds. However, something more would have been required to extend such a conclusion to the defendants. The facts provided in the June 5 Affidavit were insufficient to infer that defendants were parties to any criminal conduct on the part of Ehney.

The government argument that the FBI is shielded from a *Franks* determination because it accurately reported what was in the OTS criminal referral is not persuasive. The OTS criminal investigator who prepared the criminal referral was a government actor whose statements and conclusions which should pass scrutiny under *Franks*. *Cf. United States v. Elliott*, 893 F.2d 220, 224 (9th Cir.1990) (*Franks* applies to government actions and not non-governmental informants.)

### d. Conclusions of Law Regarding the False Pars Lease Allegation in the June 5 Affidavit

There was reference in the June 5 Affidavit to discovery by the OTS in the Home Savings loan file of a lease (the Pars Lease) that was used as collateral for loans to Executive Hills North. As it turned out, this lease was not the same document that had actually been contracted for between Executive Hills North and the tenant, Pars. The reference to this "false" lease in the June 5 Affidavit is rather cryptic and not well developed with any facts. It appears that a purpose for including this information in the June 5 Affidavit was to encourage the issuing court to draw an inference that the defendants were involved in a scheme to help Executive Hills North obtain a loan from Home Savings through the use of a fraudulent lease.

Indeed, the evidence available to the FBI at the time of the June 5 Affidavit might support probable cause to believe that Ehney and Executive Hills North submitted a false lease to Home Savings to be used as collateral to obtain a loan from Home Savings. The evidence, however, did not support probable cause to believe that defendants were involved in that scheme. The evidence available to the FBI was that an OTS examination of Home Savings' records revealed what appeared to be a discrepancy between the terms of two different copies of a lease submitted by Ehney and Executive Hills North. Further investigation then revealed yet a third lease in the possession of Ehney and Executive Hills North. This third lease appeared to be the actual lease entered into between Executive Hills North and the tenant. The terms of this third lease were the least favorable for Executive Hills North and, consequently, Home Savings as the lender. When confronted with this information, the president of Home Savings told OTS investigators that he would check with Ehney for an explanation of the discrepancy and have Morgan discuss the matter with Ehney. A meeting with Morgan, Ehney and others occurred at the site of the building where the space was leased. Morgan, Ehney and the others walked through the building and at the end of this visual inspection, Morgan observed that the presence of a tenant in the building solved the problem. The details of the walk-through and the comments of Morgan, while they were known to the FBI, were not included in the June 5 Affidavit.

The facts about the PARS Lease known to the FBI did not support an inference that defendants were involved with Ehney in a scheme to submit a false lease to Home Savings. If the issuing court had been provided with these facts it likely would have reached the same conclusion. Instead, the issuing court was provided with cryptic references to a seemingly fraudulent transaction, all designed to lead the issuing court to infer that the defendants were involved in the fraud when the known facts did not support that inference.

### e. Conclusions of Law Regarding the Kickbacks Allegation in the June 5 Affidavit

Grissom was the comptroller of Executive Hills North, a business associate of Ehney's,

and a cooperating witness for the FBI in its investigation of the defendants. Contained in the June 5 Affidavit was information from Grissom concerning kickbacks of funds from Ehney and Bridges to the defendants in exchange for loans from the defendants' financial institutions. While Grissom was the FBI's sole source for this information, it was not based on Grissom's personal knowledge, but rather on statements made to Grissom by Ehney.

The June 5 Affidavit accurately stated the information relayed to the FBI by Grissom. Furthermore, at the time of the June 5 Affidavit, Grissom had been cooperating with the FBI for a period of several months and the FBI had no reason to doubt the veracity or credibility of Grissom. It appears from the June 5 Affidavit that this information was obtained by Grissom from Ehney during the time that Grissom was employed by Executive Hills North. This information provided the issuing court with some credible evidence that the defendants were receiving kickbacks from Bridges and Ehney in exchange for financing from financial institutions controlled by the defendants. Grissom's employment, however, ended in December 1989. It does not appear that any independent investigation was conducted by the FBI to corroborate this kickback information.

The June 5 Affidavit goes on to conclude that payments from Executive Hills North to partnerships in which the defendants, including Ehney, were involved, corroborate Grissom's information concerning kickback. Those payments are discussed earlier under the heading "Home Savings $26 Million Loan." This court believes that a complete review of the bank records of Ehney and Executive Hills North does not support the conclusion that the payments represented kickbacks. Thus, the Court does not find this information corroborative of Grissom's kickback allegations. At the very least, the issuing court was provided incomplete information about the Home Savings $26 million loans and was deprived of the opportunity to make its own independent judgment of whether those transactions corroborated Grissom's statements concerning kickbacks.

### f. Conclusions of Law Relating to the Information Regarding Saturday Morning Meetings Contained in the June 5 Affidavit

In order to justify electronic surveillance of the Saturday morning meetings of the defendants at M–D Management, it was necessary to establish that any criminal activity in which the defendants were involved would be discussed at the Saturday morning meetings. 18 U.S.C. § 2518(3); *United States v. Leisure*, 844 F.2d at 1354. The June 5 Affidavit clearly establishes that the defendants, together with other business associates, met on a regular basis on Saturday mornings at M–D Management to discuss their business dealings.

The June 5 Affidavit concludes that if normal banking business was discussed at the Saturday morning meetings, there would be no need for Bridges to be present because Bridges was not an owner or director of any of the financial institutions controlled by the other defendants. Likewise, the June 5 Affidavit reasoned that if normal partnership business was discussed at these meetings, there would be no reason for Feingold to be present at the meetings because the FBI's investigation had not revealed Feingold to be a member of any of the relevant partnerships discussed in the Affidavit.

Although the June 5 Affidavit advised the issuing court that Feingold was the son-in-law of Morgan and the president of Metro North, it did not advise the issuing court that Feingold was a partner in MT Investment Company and a 100% owner of MD Associates # 3, both of which were partners in several of the partnerships referred to elsewhere in the June 5 Affidavit. This information renders inaccurate the statement in the June 5 Affidavit that Feingold was not a partner in the partnerships discussed in the affidavit. While this misstatement may not have been intentional, its presence in the June 5 Affidavit must be considered in light of other misstatements, overstatements and omissions. Additionally, the misstatement was a critical component of the FBI's conclusion that illegal activity must be discussed at the Saturday morning meetings when Bridges and Feingold were also present. As

a result, this conclusion is not supported by the total information available to the FBI.

Much of the information in the June 5 Affidavit regarding the Saturday morning meetings at M–D Management was attributed to Randy Nay, who was identified in the affidavit only as a confidential source. A fair reading of this information is that, at least while Nay was present, banking business was discussed and the contents of *those* meetings was not discussed outside the meetings. This information was accurately and fairly presented in the June 5 Affidavit. However, later in the June 5 Affidavit, specifically at Paragraph 46(b), the FBI described the Saturday morning gatherings as the secret meetings of the defendants. Again, considered alone, the use of the term "secret" to describe a meeting where admittedly confidential banking business matters are discussed is not particularly egregious. However, it is another example of the FBI's use of over-reaching, and sometimes misleading and inaccurate, phrases to describe factual occurrences in the light most favorable to the conclusion of the FBI wanted the issuing court to reach.

In yet a further example of this disturbing pattern, the June 5 Affidavit attributes to Nay the conclusion that once his business was completed, he "was not allowed to stay" at the Saturday morning meetings and was "dismissed." Rather than using these terms, Nay told the FBI that he would discuss whatever banking business brought him to the meeting and he then would leave. Nay's testimony on this issue was supported by the FBI report of its interview of Nay. He did not characterize these circumstances to the FBI as "not being allowed to stay" or being "dismissed." Nay also advised the FBI that, as a participant in many of these Saturday morning meetings and as the former senior lending officer at Home Savings, he did not believe that the defendants were engaged in bank fraud or had committed any illegal acts. This latter information also did not find its way into the June 5 Affidavit.

Grissom was used as a source for information in the June 5 Affidavit that a particular Saturday morning meeting between Morgan, Ehney and others, including Grissom, to discuss the Pars Lease occurred at M–D Management. The location of this meeting was important to the Affidavit because it provided a specific instance of activity that, according to the Affidavit, was criminal in nature and was discussed at M–D Management. However, despite the many FBI interviews of Grissom and the FBI reports of those interviews, there is no written record of Grissom ever telling the FBI that this meeting occurred at M–D Management. To the contrary, Grissom denied making such a statement to the FBI. Additionally, Grissom and Leland Gerhardt, the only two persons present at the Pars lease meeting who testified, both said that the meeting did not occur at M–D Management, but rather it happened at the Executive Hills North building where the space at issue was leased. The location of this meeting is consistent with the walk-through of the lease space that occurred that same day and which is described in FBI reports. On this record, the Court concludes that the FBI had information establishing that the meeting to discuss the Pars Lease occurred at an Executive Hills North building and did not occur at M–D Management. While this misstatement in the June 5 Affidavit may not have been intentional, it must also be considered in light of the other inaccuracy and overstatements in the Affidavit.

## 2. *Conclusions of Law Regarding the Staleness and Significance of the Ongoing Activity Alleged in the June 5 Affidavit*

■ All of the information discussed above and the majority of activity discussed in the June 5 Affidavit occurred in the years 1987–1989. Even if this information constituted probable cause to believe that defendants had engaged in criminal activity, there must still be reason to believe that defendants' criminal activity was continuing at the time the electronic surveillance was sought and authorized. *United States v. Dennis, supra*, 625 F.2d 782, 792 (8th Cir.1980). "[T]he element of time is crucial to the concept of probable cause." *United States v. Schauble*, 647 F.2d 113, 114–15 (10th Cir. 1981) (quoting *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir.1972)). To validate

the intrusion of electronic surveillance, probable cause "must exist at the time in which the [court authorization] is issued, not at some earlier time." *United States v. Steeves,* 525 F.2d 33, 37 (8th Cir.1975). Even otherwise reliable information may not form the basis of probable cause where that information is stale. *United States v. Webster,* 639 F.2d 174, 178 (4th Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), *modified in part,* 669 F.2d 185 (4th Cir.1982).

The mere lapse of time between the stated information and the request for court authorization is not controlling or dispositive. Rather, the nature of the criminal activity involved must be considered. *United States v. Macklin, supra,* 902 F.2d at 1326. "Where [the criminal activity] is continuous and ongoing, ... any lapse of time is less significant." *Id.; See also, United States v. Jones,* 801 F.2d 304, 314 (8th Cir.1986) (passage of time between events and issuance of warrant is less significant with continuing criminal enterprise); *United States v. Lueth, supra,* 807 F.2d at 727 (continuous and ongoing criminal activity relevant to probable cause determination).

The June 5 Affidavit relied on two circumstances to demonstrate probable cause for an ongoing belief that defendants were engaging in or discussing criminal activity at the Saturday morning meetings at M–D Management. The first was a potential transaction involving a property at 127th and Antioch in Overland Park, Kansas. The second was a Standstill Agreement entered between Bridges and Home Savings.

### a. Conclusions of Law Relating to the 127th and Antioch Property Information Included in the June 5 Affidavit

The FBI was aware that its historical information regarding defendants might be stale. As a result, the FBI approached Grissom less than two months before the June 5 Affidavit in an effort to obtain more current information about defendants. During this meeting, Grissom told the FBI about a piece of property at 127th and Antioch in Overland Park, Kansas. This property was owned by a small group of developers who were having

trouble making their mortgage payments on the property. The mortgage was held by a Morgan-controlled financial institution. These developers told Grissom that if their property was foreclosed upon, Bridges might have a viable tenant for the property. In response to an FBI hypothetical posed to Grissom, he told the FBI that *if* this property were foreclosed upon and *if* Bridges had a viable tenant for the property, Bridges *could* turn to a Morgan-controlled financial institution to borrow funds to buy the property. *If* this happened and Bridges developed the property, Morgan *might* receive a kickback similar to those Grissom had previously described to the FBI. Grissom also believed that *if* this scenario came to pass, it likely would be discussed at the Saturday morning meetings.

This information is simply too speculative to provide a reasonable basis to believe that in June 1991 the defendants were involved in the same practice of taking kickbacks Grissom had described in 1989. At the time this information from Grissom was provided to the issuing court, Grissom had not been employed by Executive Hills North or otherwise involved with the defendants for approximately 18 months.

The only factual information the FBI had about the property at 127th and Antioch was that its developers were having difficulty meeting the mortgage payments and the mortgage was held by a Morgan-controlled financial institution. Before this information could provide a reasonable basis to believe that the defendants were engaged in ongoing criminal activity, too many contingencies had to fall into place. First, the property had to actually be foreclosed upon. At the time of the June 5 Affidavit no such proceedings had begun. Second, Bridges had to have a viable tenant for the property. No corroboration for Grissom's statement that such a tenant existed was provided in the Affidavit. Third, Bridges had to buy the property. · Fourth, in buying the property, Bridges had to obtain financing from a Morgan-controlled financial institution. Fifth, in exchange for that loan, Bridges had to follow the same pattern described by Grissom some 18 months earlier. If all of this had transpired, there would then

have been a reasonable basis to believe this transaction would have been discussed at the Saturday morning meetings. However, absent better information that these contingencies would occur, they remained contingencies that were too speculative to form a probable cause belief that defendants were engaged in a continuing scheme of illegal kickbacks.

### b. Conclusions of Law Regarding the Standstill Agreement Referenced in the June 5 Affidavit

The other basis asserted in the June 5 Affidavit for probable cause to believe that defendants were engaged in ongoing criminal activity was a Standstill Agreement between Home Savings and Bridges. The Standstill Agreement arose from the default by Executive Hills North on the $26 million loan from Home Savings discussed above. Bridges had been a guarantor on this loan. When the loan was foreclosed upon by Home Savings, the financial institution acquired the property from Executive Hills North by a deed in lieu of foreclosure. Home Savings determined that Ehney did not have sufficient assets to cover his guaranty of the deficiency balance on the loan, but that Bridges did have such assets. However, even if Home Savings succeeded in pursuing Bridges on his guaranty, it would still be the owner of a piece of commercial property that had no tenant. At this point, Bridges and Home Savings entered the Standstill Agreement. In the Standstill Agreement, Bridges agreed that his deficiency on the loan would be $8 million, he would waive certain defenses in any suit by Home Savings to enforce the guaranty and he would provide free management services to Home Savings in an attempt to lease the property. In exchange, Home Savings agreed to postpone any enforcement efforts on the guaranty for a period of two years.

The June 5 Affidavit concluded that the Standstill Agreement represented evidence of on-going criminal activity by defendants because:

> ... this agreement appears to benefit Bridges, Morgan, Ozar and Dreiseszun in that if Bridges were pursued civilly, the aforementioned partnerships detailed in Paragraphs 21(a) through 21(1) would come under scrutiny. Further, this agreement postpones the potential monetary loss which would be incurred by Bridges and the subsequent impact on his partnerships with Morgan, Ozar and Dreiseszun.... if [Home Savings] sued Bridges, this would place Bridges in a very precarious financial condition. As stated previously in this affidavit, Bridges is the principle vehicle by which Morgan, Ozar and Dreiseszun partnerships receive money and, therefore, if Bridges became financially strained, he would be ineffective in this capacity. (June 5 Affidavit at Paragraph 28(e)).

These statements represent adversarial arguments, as opposed to facts, presented to the issuing court. It is unclear how much credence, if any, the issuing court placed on these arguments. Additionally, these arguments presume that the Standstill Agreement was entered into by Bridges as a means to cover up inquiry into his and the other defendants' financial dealings, as opposed to the legitimate business transaction it most likely represented. No facts were provided to support the FBI's presumption that Bridges was using the Standstill Agreement as a cover to forestall a full financial inquiry. There also was no factual basis contained in the June 5 Affidavit to support the statement Bridges would be placed in a precarious financial position if Home Savings did decide to enforce his guaranty. Indeed, Bridges financial condition was not addressed at all in the June 5 Affidavit. In fact, in May 1991, the OTS was unsure of the details of Bridges' financial condition.

The June 5 Affidavit also sought to infer that Bridges was interested in refinancing the debt on this property, that discussions about any such refinancing would involve criminal activity and that those discussions would occur at the Saturday morning meetings. This inference was supported by an offer to buy the property Bridges had made to the Resolution Trust Corporation ("RTC") after the RTC seized control of Home Savings. The June 5 Affidavit did not inform the issuing court, however, that this offer expired prior to June 5, 1991 or that, as of

**1576**

June 5, 1991, the RTC had received no additional offers from Bridges to buy the property.

These circumstances do not support probable cause to believe defendants were involved in ongoing criminal activity in June of 1991. To support such probable cause, it would be necessary to conclude that Bridges remained interested in buying the property, that any financing he might obtain would necessarily involve a Morgan-controlled financial institution, that in exchange for this financing Morgan would insist upon a kickback from Bridges, and that these matters would be discussed at Saturday morning meetings. Under the circumstances known to the FBI or even those presented to the issuing court, too much speculation and uncertainty is involved to support a conclusion that defendants remained engaged in criminal activity.

**B. CONCLUSIONS OF LAW REGARDING THE "NECESSITY" FOR COURT ORDERED ELECTRONIC SURVEILLANCE IN THIS INVESTIGATION**

■ Title III imposes a "necessity requirement" that must be satisfied prior to the authorization of electronic surveillance. *United States v. O'Connell,* 841 F.2d 1408, 1414 (8th Cir.), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988). This requirement prohibits the conduct of electronic surveillance unless normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if tried, or are too dangerous. 18 U.S.C. § 2518(3)(c). Title III also requires that applications for electronic surveillance contain "a full and complete statement" as to the exhaustion of alternative investigative methods. 18 U.S.C. § 2518(1)(c).

■ Title III restricts electronic surveillance to those situations where the interference is both necessary and reasonable. *United States v. Garcia,* 785 F.2d 214, 223 (8th Cir.), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986). Although electronic surveillance is not restricted to an investigative tool of last resort, *e.g., United States v. Jones,* 801 F.2d at 314, it must be "used with restraint." *United States v. Gior-*

*dano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974).

■ Title III does not require the Government to exhaust every available investigative technique before a wiretap may be authorized. In *United States v. Daly,* 535 F.2d 434, 438 (8th Cir.1976), the court explained:

But Congress did not require the exhaustion of "specific" or "all possible" investigative techniques before wiretap orders could be issued. *United States v. Smith,* 519 F.2d 516, 518 (9th Cir.1975). Congress prohibited wiretapping only when normal investigative techniques are *likely* to succeed *and* are not too dangerous. "Merely because a normal investigative technique is theoretically possible it does not follow that it is likely." S.Rep. 90–1097, U.S.Code Cong. and Admin.News, pp. 2112, 2190 (1968). Sections 2518(1)(c) and 2518(3)(c) are only designed to ensure that wiretapping is "not to be routinely employed as the initial step in criminal investigation," [citing case] and " * * * to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn* 415 U.S. 143, 153, 94 S.Ct. 977, 983, 39 L.Ed.2d 225, 236, n. 12 (1974). The government's showing must, of course, be tested in a "practical and common sense fashion." [Citing cases.] And as in other suppression matters, considerable discretion rests with the judge to whom the wiretap application is made. *United States v. Smith, supra,* 519 F.2d at 518.

*See also United States v. Macklin,* 902 F.2d at 1326–27. A determination by the issuing court that the necessity requirement has been satisfied is a finding of fact that can only be reversed if clearly erroneous. *United States v. Macklin,* 902 F.2d at 1327; *United States v. Davis,* 882 F.2d 1334, 1343 (8th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 610 (1990).

■ The June 5 Affidavit contained, at Paragraphs 46 and 47, a detailed statement of the various investigative techniques that were available to the FBI in this case and

the reasons those techniques had not worked, reasonably appeared unlikely to work or were too risky to attempt. In retrospect, the FBI's investigation of the defendants may have been better served if some of these investigative techniques had been more thoroughly used before resorting to electronic surveillance. However, the discussion in the June 5 Affidavit of alternative investigative techniques used and considered by the FBI is thorough and the finding of the issuing court that the necessity requirement of Title III was satisfied is not clearly erroneous.

Although the finding of necessity is not clearly erroneous, the extent of the FBI's investigation of the defendants prior to resorting to electronic surveillance is relevant to the totality of the circumstances considered in determining the appropriate weight to be afforded the many conclusions and inferences drawn by the FBI in the June 5 Affidavit. *Illinois v. Gates, supra.* For example, the FBI's total reliance on the OTS criminal referral, without conducting its own independent investigation of the conclusions reached by the OTS criminal referral, was hardly a prudent decision by the country's leading law enforcement agency. This is especially true since the criminal referral represents only the preliminary findings of the OTS investigator and, by its very nature, the criminal referral passed the matter on to the FBI for further investigation.

Additionally, the FBI chose not to interview a host of potential witnesses or to subpoena the business records of the defendants and the related financial institutions and partnerships before utilizing electronic surveillance. While the FBI's explanation for its decision not to pursue many of these investigative techniques, i.e., fear that its investigation would be made known to the defendants, might be sufficient for purposes of the Title III necessity requirement, nonetheless the failure to conduct this independent investigation has an impact on the credibility and reliability of information and conclusions presented in the June 5 Affidavit.

The FBI relied extensively on Grissom's version of statements made to him by Ehney, Adams, Cosgrove and Gerhardt. No interview of these individuals or other persons

close to them was attempted. The FBI did not attempt to interview accountants or other business associates of the defendants. The FBI did not attempt to subpoena many of the financial records of the defendants or their related businesses. In fact, the FBI chose to wait and subpoena these records only *after* the electronic surveillance was in place in the hope that conversations about the subpoenas would be intercepted. The FBI did not attempt to interview FRB and FDIC regulators who had examined some of the same transactions that were at the heart of the June 5 Affidavit. The FBI did not attempt to interview David Skidgel, even though he was an RTC attorney whose dealings with Bridges were specifically mentioned in that section of the June 5 Affidavit that dealt with the potential ongoing criminal activity of defendants.

Certainly the FBI's investigative efforts before the June 5 Affidavit do not control whether probable cause existed to believe that defendants were engaged in criminal activity. However, in light of the pattern of misstatement, overstatement and omission reflected by the June 5 Affidavit, the extent of the FBI's investigative efforts can be considered in determining the weight and credibility that should be afforded the conclusions and inferences the FBI drew in the June 5 Affidavit. In that regard, the FBI drew significant and important conclusions in the June 5 Affidavit that were based on minimal and sometimes inadequate facts. It appears to this Court that some of those conclusions, and the inferences the FBI wanted the issuing court to draw from those conclusions, were wrong and a more thorough investigation would have revealed that to the FBI. This is particularly true of the FBI's conclusions and inferences in the June 5 Affidavit concerning the Metro North loans to Bridges, the Pars Lease, the One Petticoat Lane loan and the Standstill Agreement.

**C. CONCLUSIONS OF LAW REGARDING THE DEGREE OF MINIMIZATION OF INTERCEPTIONS EMPLOYED BY THE FBI DURING THE SURVEILLANCE IN THIS INVESTIGATION**

 Title III provides that electronic surveillance "shall be conducted in such a

way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). This statutory provision implements "the constitutional mandate ... that wiretapping must be conducted with particularity." *United States v. Daly,* 535 F.2d 434, 440 (8th Cir.1976). The minimization requirement requires the Government to reduce, to the maximum extent possible, the interception of communications other than those it has authority to intercept. *Macklin,* 902 F.2d at 1328; *Daly,* 535 F.2d at 441. Congress enacted § 2518(5) to comply with the mandate of *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), that investigators conduct wiretapping with particularity. *United States v. Garcia,* 785 F.2d 214, 224 (8th Cir.), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986); *United States v. Daly,* 535 F.2d at 440. The standard is one of reasonableness but § 2518(5) does not establish a per se rule regarding minimization. Each case must be examined on its own particular facts. *Scott v. United States,* 436 U.S. 128, 140–41, 98 S.Ct. 1717, 1724–25, 56 L.Ed.2d 168 (1978); *Garcia,* 785 F.2d at 224 (quoting *Scott v. United States,* 436 U.S. 128, 139, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978)); *United States v. O'Connell,* 841 F.2d at 1416; *Daly,* 535 F.2d at 441. Where, as here, the adequacy of the Government's minimization effort is challenged, the Government bears the burden of establishing that its conduct "avoided unnecessary intrusion and resulted in '... no greater invasion of privacy ... than [was] necessary under the circumstances.'" *United States v. Armocida,* 515 F.2d 29, 43 (3rd Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975) (quoting *Berger v. New York,* 388 U.S. 41, 57, 87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040 (1967)); *see also United States v. Torres,* 908 F.2d 1417, 1423 (9th Cir.), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 228 (1990); *United States v. Rizzo,* 491 F.2d 215, 217 (2d Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

■ Some latitude obviously must be afforded to monitoring agents who are charged with the difficult task of determining which intercepted conversations are pertinent and which are not, which should be minimized and which listened to. In *United States v. Daly,* 535 F.2d at 441–42, the court recognized

... monitoring agents are not gifted with prescience. *United States v. Cox, supra,* 462 F.2d [1293] at 1301 [ (8th Cir.1972) ]. Interception of innocent conversations cannot be totally eliminated. Because even innocent conversations often times turn to criminal matters, spot-checking of such conversations is permissible especially in a case such as this involving a broad scope of criminal activity and a sophisticated criminal element.

■ The FBI's experience in conducting the electronic surveillance in this case leads to two inescapable conclusions. First, electronic surveillance in investigations of complex business fraud poses special problems for the Government because of the inherent difficulty in determining which conversations represent criminal activity and which represent legitimate business activity. The result may be, as it was in this case, that virtually all of the conversations are intercepted despite the requirement of Section 2518(5) that non-authorized interceptions must be minimized. The special problems the Government faces in conducting electronic surveillance in complex business fraud cases does not mean that electronic surveillance cannot be used as an investigative tool in such cases. However, it does mean that if the Government chooses to use electronic surveillance in complex business fraud cases, such as this one, it must accept responsibility for and deal with the special problems of minimizations.

Second, the failure of the FBI to adequately minimize and guard against the interception of attorney/client conversations resulted in that privilege being seriously compromised. The nature of the defendants' Saturday morning meetings was such that their attorneys often attended those meetings or had telephone conversations with the defendants. This circumstance also presented a special problem for the FBI. Nonetheless, it was incumbent upon the FBI to deal with this problem and guard against the unwarranted interception of attorney/client conversations. Unfortunately, its efforts to address

this special problem were largely unsuccessful.

### a. Conclusions of Law Regarding the Minimization of the Interception of Non–Pertinent Conversations

In order to discharge their responsibility under Title III and the issuing court's order to minimize the interception of unauthorized conversations, FBI monitoring agents were provided with instructions on how to properly monitor and minimize the electronic surveillance. The special problems of minimization faced by the FBI in this case were magnified by these minimization instructions. The problem was caused both by what the instructions said and what the monitoring agents thought they meant.

Generally, pursuant to the requirements of both Title III and the court's authorizing order, monitoring agents could intercept conversations pertinent to the bank fraud investigation outlined in the June 5 Affidavit. They could not listen to legitimate business conversations not pertinent to the investigation or other non-criminal conversations. The difficulty for monitoring agents in any electronic surveillance, and particularly in this one, is determining what is pertinent to the investigation and what is not. To address this problem, monitoring agents were instructed that they could listen to a conversation for a period up to two minutes to determine if it was pertinent. Beyond that time, if it was still unclear that the conversation was related to the bank fraud investigation, the agents could listen until it was clear that the conversation no longer related to the bank fraud investigation.

The minimization instructions went on to provide that if monitoring were stopped, the agents had to stay away from the conversation for a minimum of one minute, but could then "spot-check" the conversation for a period of up to two minutes to see if the parties or subject matter of the conversation had changed. This was known as the "two minutes up, one minute down" instruction. The effect of this instruction was that monitoring agents would maximize the time they could listen to a conversation and minimize the time they could not. As a result, this instruction allowed agents essentially to monitor two-thirds of every conversation.

This circumstance was exacerbated by the way monitoring agents understood and implemented the minimization instructions. The minimization instructions allowed monitoring beyond the two minute period if it was unclear that the conversation was criminal, but *may* relate to the bank fraud investigation. In that event, the monitoring could continue until it was clear the conversation *did not* relate to the investigation. Monitoring agents interpreted this instruction to mean they could listen to any conversation they did not understand for however long it took for the subject matter of the conversation to become clear. Monitoring agents understood this to be the case even if the agents could not understand enough of the conversation to know if it was *criminal* or *may* relate to the bank fraud investigation. The net effect of this interpretation, together with the two minutes up, one minute down instruction, was that an extremely large number of otherwise innocent conversations were intercepted in whole or in large part.

These circumstances were again made worse by the complicated and sophisticated nature of the business conversations involving the defendants. The defendants were extremely successful business and real estate developers; their interests not only dominating the Kansas City business community, but also stretching throughout the United States. Much of their business was conducted and discussed at the Saturday morning meetings at M–D Management. Even assuming that the defendants did engage in discussions of criminal activity at those meetings, it was apparent they also engaged in discussions of perfectly legitimate business activities. Distinguishing between the two was most difficult for the monitoring agents. Prior to implementation of the electronic surveillance, the monitoring agents received no special training or education, other than a simple briefing on the investigation, to assist them in understanding the financial dealings of the defendants. As a result, even those monitoring agents who initially felt comfortable with their understanding of financial matters, quickly found that defendants' conversations

were highly sophisticated and could not be readily deciphered. This meant that many conversations would be intercepted well beyond the two minute requirement, not because monitoring agents thought they were criminal or may relate to the bank fraud investigation, but because the agents simply did not understand the subject matter well enough to determine if the conversation was pertinent.

Additionally, monitoring agents tended to err liberally, instead of conservatively, in deciding what was pertinent. Since the subject matter of the investigation involved potential bank fraud and the June 5 Affidavit mentioned particular lease and loan transactions, the agents tended to conclude that any conversations involving banks, loans or leases were pertinent and should be monitored beyond the two minute minimum. Needless to say, for businessmen whose dealings were of the magnitude of the defendants, most of their conversations in fact necessarily dealt with banks, loans and leases. However, it is doubtful, and the Government has not shown, that most of these conversations related to the bank fraud investigation outlined in the June 5 Affidavit.

This conclusion is borne out by an analysis of the telephone conversations that were monitored by the FBI. A total of 8,126 minutes of telephone conversations were intercepted, of which 223 minutes, or 2.75%, ultimately were deemed pertinent by the Government. Although "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide" to whether the electronic surveillance was properly minimized, *Scott v. United States,* 436 U.S. at 140–141, 98 S.Ct. at 1724–25, this example is illustrative of the difficulty, and lack of success, the FBI had in deciding what was pertinent and what was not.

It is not particularly surprising that the FBI faced this problem in a business fraud investigation of this magnitude. What is troubling is the way the FBI responded to this problem. Rather than restrict the number, length and scope of its interceptions in order to avoid unnecessary intrusion or invasion of privacy in compliance with the minimization requirements of Section 2518(5), the

FBI instead *broadened* its interceptions to such an extent that reasonable minimization did not occur.

## 2. Conclusions of Law Regarding the Minimization of the Interception of Privileged Conversations

 In drafting Title III, Congress recognized the potential for interference with the attorney-client privilege and included provisions aimed at specifically protecting the privileged character of communications between attorney and client. Section 2517(4) of the statute provides that "[n]o otherwise privileged wire, oral, or electronic communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character." 18 U.S.C. § 2517(4). The Senate Report reflects Congress' desire to protect legally privileged communications:

> Traditionally, the interest of truth in the administration of justice has been subordinated in the law to the interest of preserving privileged communications where four relationships have been involved: physician-patient, lawyer-client, clergyman-confidant, and husband-wife. The scope and existence of the privileges varies from jurisdiction to jurisdiction. The proposed provision is intended to vary existing law only to the extent it provides that an otherwise privileged communication does not lose its privileged character because it is intercepted by a stranger.

S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. and Admin.News 2112, 2189.

In addition to the problem of distinguishing pertinent from non-pertinent calls, the FBI also had to deal with the problem of protecting against the interception of attorney/client conversations. Prior to beginning the electronic surveillance, the FBI was aware of the potential that attorney/client conversations might be intercepted by recognizing the likelihood that the defendants were represented by counsel and that these attorneys might be present at Saturday morning meetings. However, before implementing the electronic surveillance, the FBI made no attempt to determine the identity of

attorneys who represented the defendants. As a result, although the FBI properly recognized the special problem it faced concerning the interception of attorney/client conversations from the outset, it did nothing to identify those attorneys in order to help monitoring agents avoid these conversations.

Once again the minimization instructions given to the monitoring agents and the way those instructions were understood by the agents posed problems. The FBI agent who supervised the telephone wiretaps properly instructed monitoring agents about how to deal with attorney/client conversations. He advised his monitoring agents that when an attorney was on the line, the agent should get out of the conversation and stop monitoring, regardless of what might be the subject of the conversation. Unfortunately, this instruction was not followed by many of the monitoring agents.

It was the understanding of many the monitoring agents that they could monitor a conversation involving an attorney unless they had affirmative information that the attorney was representing all of the participants of the conversation. Since the FBI made little, if any, effort to determine which attorneys represented the defendants and others subject to the investigation, this understanding opened the door for the FBI to monitor a large number of conversations where attorneys were present and legal matters were discussed.

Additionally, it was the understanding of these agents that, even if the FBI knew that a conversation was subject to the attorney/client privilege because the attorney represented all of those present, the agents could still spot-check that conversation on the basis of the two minutes up, one minute down instruction. The effect of this understanding was to give agents the green light to listen to two-thirds of conversations that were admittedly subject to the attorney/client privilege. The results of the electronic surveillance demonstrated that a disturbing number of conversations between the defendants and attorneys were intercepted either in their entirety or in large part.

The most troubling of these examples were assorted conversation involving attorneys R.J. Campbell and Anthony Luppino. The electronic surveillance in this case began on June 8, 1991. It was not until June 21, 1991, two weeks after the electronic surveillance began, that the FBI says it learned that Campbell was an attorney who represented Morgan. It seems incredible that in an investigation of this magnitude and nature which, according to the FBI, had been ongoing since 1989, the FBI would not know who represented the lead target of the investigation until two weeks after electronic surveillance began. This is particularly true since at least two newspaper articles, dated June 6 and June 13, 1991, discussing the FBI investigation of Morgan named Campbell as his attorney. Both articles were in the FBI files. Additionally, when Campbell's name, but not his identity as an attorney, appeared in the first ten-day report presented to the issuing court on June 17, 1991, the court specifically asked the FBI agents if this was the same Campbell who was an attorney. Finally, on June 15, 1991, the FBI intercepted a conversation between Campbell and defendant Morgan. This conversation was 38 minutes in length and over 31 minutes of the conversation were intercepted. Based on the content of this conversation, it was unambiguously apparent that Campbell and Morgan were discussing matters of a legal nature.

Despite all of these red flags, the FBI maintained that it was not until June 21, 1991, that it learned that Campbell was an attorney who represented Morgan. It learned this information only after it attempted to serve some grand jury subpoenas. In response to that attempt, Campbell himself contacted the FBI on behalf of Morgan. When Campbell contacted the FBI he was specifically asked about and confirmed that he represented Mark Morgan, Ozar and Dreiseszun. Campbell was not asked by the FBI if he represented any other of the named interceptees, such as Bridges or Feingold, whose conversations were the subject of the electronic surveillance. When Campbell subsequently was asked by an Assistant United States Attorney several weeks later whether he represented Bridges and Feingold, he readily responded that he did. Not knowing that the electronic surveillance was

in place, Campbell had no reason to volunteer to the Government that he represented Bridges and Feingold.

As of June 21, 1991, the FBI knew that Campbell was an attorney who represented Morgan, Ozar and Dreiseszun. Accordingly, the FBI knew it should not listen to conversations involving Campbell and those individuals. However, even at this same time, monitoring agents were instructed that they could monitor conversations where Campbell was present if there was someone else present who the FBI did not affirmatively know was represented by Campbell. This instruction is particularly troublesome because it put the burden on Campbell to make a disclosure to the FBI about who he represented at a time when he had no reason to know such a disclosure was necessary. At the same time, this instruction excused the FBI from making its own inquiry about who Campbell represented, at a time when the FBI already knew Campbell represented several of the named interceptees. Effectively, the FBI was allowed to engaged in willful blindness and monitor conversations which included Campbell, Bridges and Feingold without ever asking Campbell if he represented Bridges and Feingold. This strategy played out with the FBI monitoring many conversations that involved Campbell after June 21, 1991.

The saga of attorney Campbell does not end here though. As a result of a conversation between Campbell and Morgan on June 15, 1991, Campbell himself was added as a named interceptee of the electronic surveillance for a period of 30 days beginning July 5, 1991. It was the FBI's position, set out in a subsequent affidavit to the original issuing court, that there was probable cause to believe that Campbell and Morgan had a conversation on June 15, 1991, where an illegal loan transaction was discussed. The sole basis for this conclusion was the discussion between Morgan and Campbell about financing a loan for a borrower in Omaha, Nebraska. According to the FBI, this conversation represented criminal activity similar to that described in the June 5 Affidavit because Campbell described the loan as "tricky" and indicated that "the borrower is not the own-

er." From these statements the FBI represented to the issuing court that there was probable cause to believe bank fraud was being discussed.

What the FBI failed to tell the issuing court about this conversation was that Campbell and Morgan were discussing loan financing for a "wrap mortgage." The FBI did not tell the issuing court that the conversation centered around a wrap mortgage because the FBI did not consider that pertinent to the conversation. In fact, the affiant did not know or understand the meaning of the term "wrap mortgage."

Omission of this fact was critical to determining whether it was appropriate to add Campbell as a named interceptee. Had the issuing court been advised that this conversation centered around a wrap mortgage and been advised of the nature of such a transaction, it likely would have concluded that reference to a wrap mortgage financing as "tricky" was not unusual and that when a wrap mortgage is involved, in fact, "the borrower is not the owner" of the property. Armed with this information, which should have been provided, it is unlikely the issuing court would have concluded that this conversation stated probable cause to suspect criminal activity and Campbell would not have been added as a named interceptee. At any rate, Campbell was added as a named interceptee on the electronic surveillance for a period of 30 days. It may not be surprising that Campbell's name was removed as a named interceptee at the end of the 30 day period because no criminal conversations involving Campbell were intercepted.

Two final examples of intercepted conversations involving Campbell are significant. The first occurred on November 22, 1991 and included Campbell, Jack Fingerish (Campbell's law partner), Morgan and another attorney. This conversation involved a discussion with Morgan of a grand jury investigation of Morgan. The conversation was intercepted and reported to the issuing court because the FBI believed it potentially involved obstruction of justice. It seems to this Court that interception of a conversation between an attorney and his client about a grand jury investigation of the client is clear-

ly the subject of the attorney/client privilege. To justify the interception of this conversation because it potentially involved obstruction of justice makes a mockery of, and potentially renders meaningless, the attorney/client privilege and the minimization requirements of 18 U.S.C. § 2518(5).

The second interception occurred on December 6, 1991 and involved a conversation between Campbell, Morgan and Dreiseszun. During this conversation, Campbell discussed with Morgan and Dreiseszun the ongoing FBI investigation of them and conversations Campbell had with the Assistant United States Attorney in charge of the investigation. This conversation was protected by the attorney/client privilege and there was no reason it should have been intercepted.

Campbell was not the only attorney whose conversations were the subject of interception by the FBI. On June 22, 1991, the FBI intercepted a conversation between Anthony Luppino (another law partner of Campbell), Morgan, Dreiseszun and Feingold. During this conversation, Luppino explained the tax implications of various transactions and the corresponding optimum way to structure those transactions. The conversation lasted 55 minutes, of which 50 minutes were intercepted. The subject matter of this conversation should have raised a red flag to the FBI that Luppino might be an attorney, especially having just learned the day before that Campbell was an attorney who attended many of the Saturday morning meetings. Nonetheless, following this conversation the FBI took no steps to determine whether or not Luppino was an attorney because it assumed he was an accountant. Unfortunately, that assumption was wrong.

Following this instance, and even *after* the FBI was aware that Luppino was an attorney, a large number of conversations involving Luppino were intercepted. An important example occurred on July 13, 1991, when a conversation involving Luppino was intercepted for a period of 19 minutes without interruption. The next 10–day report that was filed with the issuing court did not mention at all this conversation even though the FBI knew that Luppino was an attorney. The stated reason for leaving this conversation out of the 10–day report to the issuing court was an effort by the Government to maintain the confidential attorney/client nature of the conversation.

Through the duration of this electronic surveillance, many attorney/client conversations were intercepted in whole or in part. Had the FBI taken appropriate steps to minimize these interceptions from the outset, at a time when it was conscious of the special problem it faced, subsequent inadvertent interceptions of attorney/client conversations would have been more understandable and excusable. However, the pattern of unnecessary intrusion into the attorney/client privilege beginning at the outset of the electronic surveillance and continuing to its very end did not satisfy the minimization requirement of 18 U.S.C. § 2518(5).

■ The appropriate remedy for such a pervasive breakdown of the minimization effort must be the suppression of all the fruits of electronic surveillance. Otherwise:

> Knowing only "innocent" [or attorney/client] calls would be suppressed the government could intercept every conversation during the entire period of a wiretap with nothing to lose by doing so since it would use ‛at trial only those conversations which had a definite incriminating value anyway, thereby completely ignoring the minimization mandate of Title III.

*United States v. Focarile,* 340 F.Supp. 1033, 1046–47 (D.Md.), *aff'd,* 469 F.2d 522 (4th Cir.1972), *aff'd,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

## III. Conclusion

The June 5 Affidavit presented a disturbing pattern of material misstatements, overstatements and omissions designed to mislead the issuing federal district court to conclude that there was probable cause to support the issuance of an order authorizing electronic surveillance at M–D Management. After deletion of the misstatements, correction of the overstatements, and addition of the omissions, the June 5 Affidavit would not have stated probable cause to believe defendants were engaging in or discussing criminal activity during the Saturday morning

meetings at M–D Management. Moreover, any showing of probable cause which the June 5 Affidavit arguably may have made was fatally stale, inasmuch as the Affidavit presented no showing sufficient to conclude that defendants were engaged in ongoing criminal activity in June of 1991. The conduct of the FBI in presenting an affidavit of such caliber to the issuing federal district court rises to such a level of recklessness as to mandate suppression of the evidence obtained as a result of the electronic surveillance in this case.

Furthermore, the response of the government to the problems it faced in conducting the electronic surveillance in this case did not properly meet the minimization requirements of 18 U.S.C. Section 2518(5). The Government did not reasonably act to minimize the interception of conversations it had no authority to intercept. The extensive failure to reasonably and adequately minimize the interception of innocent and privileged conversations was so serious and so pervasive that suppression of evidence obtained from the electronic surveillance is the only meaningful remedy.

Finally, the finding by the issuing federal district court that the necessity requirements of 18 U.S.C. Section 2518(3)(c) were satisfied was not clearly erroneous and should not be overturned.

For all of the foregoing reasons, it is

RECOMMENDED that the court, after making an independent review of the record and applicable law, enter an order GRANTING the motion of Defendant I.I. Ozar, Defendant Sherman W. Dreiseszun and Defendant Larry J. Bridges to suppress evidence.

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation in which to file and serve objections to the Report and Recommendation. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

February 8, 1994